JOEL A. SCHNEIDER, M.D., S.C., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schneider v. Commissioner
Docket No. 17541-87
United States Tax Court
T.C. Memo 1992-24; 1992 Tax Ct. Memo LEXIS 37; 63 T.C.M. (CCH) 1787; T.C.M. (RIA) 92024; 14 Employee Benefits Cas. (BNA) 2322; January 13, 1992, Filed *37 Decision will be entered under Rule 155. David J. Duez, for petitioner. David A. Mustone, for respondent. WHALEN, Judge. WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in, and additions to, petitioner's Federal income tax: Addition to Tax
Tax Year Ended
Deficiency
Sec. 6661
June 30, 1982
$   1,587
$   --  June 30, 1983
311,648
73,639
June 30, 1984
160,186
40,047
June 30, 1985
126,513
31,628
All section references are to the Internal Revenue Code as amended and in effect during the years in issue. After concessions by the parties, the issues for decision are: (1) Whether certain contributions, which were made by petitioner to three employee welfare benefit plans during the taxable years 1983 through 1985, are deductible under section 162(a); and (2) whether petitioner is liable for additions to tax for substantial understatement of its Federal income tax liability, pursuant to section 6661, based upon the deductions which it took for those contributions. FINDINGS OF FACT Some of the facts were stipulated by the parties and are so found. The stipulation of facts filed by the parties and *38 attached exhibits are incorporated herein by this reference. Petitioner is a professional services corporation which was incorporated by Joel A. Schneider, a medical doctor, on January 5, 1981, under the laws of the State of Illinois. During the years at issue, Dr. Schneider was petitioner's president and sole shareholder. Petitioner reported its income and expenses for Federal income tax purposes under the cash receipts and disbursements method of accounting. Its taxable year was a fiscal year ending June 30. At the time the petition in this case was filed, its principal place of business was Springfield, Illinois. In 1983, petitioner adopted the three employee welfare benefit plans and trust agreements described below. Petitioner intended each of the three plans to qualify under section 501(c)(9) as a voluntary employees' beneficiary association, a so-called VEBA. Employee Benefit Plan
On June 27, 1983, petitioner adopted the Joel A. Schneider, M.D., S.C. Employee Benefit Plan and Trust Agreement (hereinafter referred to as "Employee Benefit Plan"), effective July 1, 1982. It was established to provide dismissal wages and disability benefits for the welfare of eligible *39 employees who include "every full time employee". Under the terms of the plan, sole responsibility for its administration is given to a committee consisting of one to five persons appointed by petitioner's board of directors. The committee is responsible for interpreting the provisions of the plan, for resolving disputes and claims, and for directing the trustee as to disbursement of trust assets. During the years in issue, Dr. Schneider was the sole member of the plan's committee. Under the terms of the plan, sole responsibility for administration of the assets held in trust under the plan is given to an independent trustee which can be a bank, trust company, or other corporation possessing trust powers. The trustee is appointed, and may be removed, by the employer at any time, with or without cause. The plan also allows petitioner, as employer, to appoint an investment manager "to direct the investment and reinvestment" of all or any portion of the trust fund and, in the event of such an appointment, the trustee's authority and responsibilities are diminished. The Illinois National Bank of Springfield signed the plan as trustee and, during the years at issue, it acted as *40 trustee under the plan. In that capacity, it had absolute and exclusive ownership of the assets held in trust, and it exercised day-to-day control over, and directed the investment of, those assets. No investment manager was appointed. All of the contributions which are at issue in this case were made by petitioner to Illinois National Bank. The Employee Benefit Plan provides the following benefits: (1) In the event of personal injury or sickness (before age 55) resulting in total and permanent disability, a participating employee is entitled to a monthly benefit for life (or the actuarial equivalence thereof) of 75 percent of average monthly compensation; and, (2) at termination of employment, a participant is entitled to a severance benefit, the amount of which was based upon the participant's average weekly compensation and total years of service at the time of termination. This amount is limited to twice the participant's annual compensation during the year immediately preceding the year of termination. During the years in issue, the plan was self-insured, meaning that benefits to be provided under the plan would come from the assets in the trust funding the plan. There *41 were two participating employees as of the end of fiscal years 1983 and 1984, and three participating employees as of the end of fiscal year 1985. The following benefits and costs were computed for the two qualifying employees for fiscal year 1983: Dr. Schneider
Pat Reeves
Actual age
39
29
Retirement age
47
47
Compensation
$   850,000
$ 42,070
Severance benefit
1,700,000
84,156
Monthly disability
benefit (75%)
53,125
2,630
Present value of
severance benefit
1,019,408
27,423
Present value of
disability benefit
150,290
8,669
Normal cost of
severance benefit
143,942
2,369
Normal cost of
disability benefit
23,184
771 Assumption: Interest rate of 6 percent
The normal cost of the above benefits for both employees is $ 170,266. This amount was contributed by petitioner to the plan in 1983, as noted below. Similar computations were made for 1984 and 1985. The plan provides that "no part of the corpus or income of the Trust Fund shall revert to the Employer or be used for, or diverted to, purposes other than for the exclusive benefit of Members". This provision is subject to three exceptions which permit the employer to recover contributions *42 under limited circumstances involving the failure of the plan to qualify as tax-exempt under section 501(c)(9), good faith mistake of fact, and disallowance of the deductibility of the contributions. Under its terms, the Employee Benefit Plan can be amended or terminated as provided therein. It can be amended "by agreement of the Employer (i.e., petitioner), and the Trustee", provided that "no amendment shall cause any of the assets of the Trust to be used for or diverted to purposes other than for the exclusive benefit of Members". The plan can be terminated by action of petitioner's board of directors but, in the event of termination, the plan provides that the "Plan and its related Trust shall at all times continue in full force and effect until all assets in the Trust Fund have been distributed". It also provides: (b) Upon termination after satisfaction of all liabilities, any assets remaining will be disposed of using criteria established by the Trustee, subject to the following provisions: (i) Such remaining assets are used to provide (either directly or through the purchase of insurance), life, sick, accident or other benefits within the meaning of Regulation *43 1.501(c)(9), pursuant to criteria that do not provide for disproportionate benefits to officers, shareholders or highly compensated employees of the Employer; or (ii) Such remaining assets are distributed to Members pro-rata based on the total benefits payable to which such Member and his beneficiaries would be entitled to pursuant to ARTICLE III compared to the total benefits payable to which all Members and their beneficiaries would be entitled pursuant to ARTICLE III. (iii) Distributions based on objective and reasonable standards which do not result in either unequal payments to similarly situated Members or in disproportionate payments to officers, shareholders or highly compensated employees of the Employer.
Therefore, upon termination, the assets of the Employee Benefit Plan cannot revert to petitioner but must be distributed to or for the benefit of its employees. Educational Benefit Plan
On June 30, 1983, petitioner adopted the Joel A. Schneider, M.D., S.C. Educational Benefit Plan and Trust Agreement (hereinafter referred to as "Educational Benefit Plan"), effective July 1, 1982. It was established to provide educational benefits to the children of *44 eligible employees. Under the terms of plan, the plan administrator is given the sole responsibility for construing and interpreting the plan and deciding any disputes and claims which arise thereunder, including questions involving the entitlement to benefits. Petitioner's board of directors appoints the plan administrator which may be "a corporation, company or group of individuals, consisting of at least three persons, as long as they are not controlled by petitioner, its board or any member of the plan". The plan administrator serves at the pleasure of petitioner's board and can be removed at any time, with or without cause. Under the terms of the plan, the trustee is given sole responsibility for the administration of the trust and the management of the assets held under the trust, except in the event an investment manager is appointed. The trustee is appointed by petitioner's board and must be a bank, trust company, or other corporation possessing trust powers. The trustee serves at the pleasure of petitioner's board and can be removed from office by the board, at any time, with or without cause. The trustee is given absolute and exclusive ownership of the assets under *45 the plan and day-to-day control over the investment of said assets. The plan directs the trustee: Notwithstanding any inconsistent provision of this agreement, a member, either individually or as a Plan administrator or otherwise, shall not possess any right or power to exercise any discretion to dispose of any asset of the Trust Fund for his own benefit or the benefit of his Dependents.
During the years at issue, the Illinois National Bank served as trustee and no investment manager was appointed. All contributions were made by payment to the Illinois National Bank of Springfield, as trustee. Three dependents, all children of Dr. Schneider, were eligible for benefits from the Educational Benefit Plan as of the end of fiscal years 1983 and 1984. Four dependents were eligible for benefits under the plan as of the end of fiscal year 1985. The following benefits and costs were calculated for fiscal year 1983: Michael
Matthew
Roxanne
Date of birth
11/6/63
7/19/67
3/31/72
Starts college
9/83
9/85
9/90
Finishes college
6/88
6/92
6/97
Cost of first yr.
$ 12,000
$ 13,230
$ 16,885
Cost of last yr.
14,986
17,729
22,628
Actual age
20
16
11
Age when start college
20
18
18
Present value
of college
$ 58,879
$ 80,126
$ 76,416
Normal cost
$ 58,879
$ 28,279
$ 11,609
Assumptions: Interest rate of 6 percent    Cost of college increases 5 percent compounded annually    Children will attend 7 years of college    College will be funded up until the time dependents start attending.
*46 The normal cost of the above benefits for all three children totals $ 98,767. This amount was contributed by petitioner in 1983, as noted below. Similar computations were made for 1984 and 1985. During the plan's fiscal year ending June 30, 1984, it distributed benefits totaling $ 22,894 on behalf of Dr. Schneider's children and, during the following fiscal year, it distributed benefits totaling $ 10,300 on behalf of Dr. Schneider's children. Dr. Schneider included in gross income the benefits paid by the plan in both fiscal years. The plan provides that "no part of the corpus or income of the Trust Fund shall revert to the Employer or be used for, or diverted to, purposes other than for the exclusive benefit of Members". This provision is subject to two exceptions which permit the employer to recover contributions under certain limited circumstances involving a good faith mistake of fact and the disallowance of the deductibility of the contributions. The Educational Benefit Plan provides that it can be amended with the unanimous agreement of petitioner, the plan administrator, and the trustee. It further provides that any such amendment shall be in writing and shall be executed *47 by petitioner and the trustee, and it states "that no amendment shall cause any of the assets of the Trust to be used for or diverted to purposes other than for the exclusive benefit of Members". The Educational Benefit Plan also provides that it can be terminated by action of petitioner's board of directors. Upon termination, the assets of the Educational Benefit Plan are to be "disposed of using criteria established by the trustee", subject to the following provisions: (i) Such remaining assets are distributed to Members pro-rata based on the total benefits to which a Member's Dependents are entitled assuming enrollment of Dependents at an accredited college or university at date of termination compared to the total benefits to which all Members' Dependents would be entitled assuming their enrollments then; or (iii) Distributions based on objective and reasonable standards which do not result in either unequal payments to similarly situated Members or in disproportionate payments to officers, shareholders or highly compensated employees of the Employer.
Employees' Benefit Association Plan
On December 14, 1983, petitioner adopted the Joel A. Schneider, M.D., *48 S.C. Employees' Benefit Association Plan (As Restated) and the Joel A. Schneider, M.D., S.C. Employees' Benefit Association Trust (As Restated), effective June 30, 1982. (Hereinafter both documents are referred to as "Association Plan".) The plan was established to provide a "life benefit" to petitioner's employees, payable to the beneficiaries of an employee in the event of the employee's death. Under the terms of the Association Plan, benefits are funded through, and all contributions are required to be made to, the related trust. The terms of the plan do not limit who can serve as trustee under the plan. Initially, Dr. Schneider and his wife were trustees, but the plan was amended on March 26, 1984, to provide that "the named fiduciary is the Illinois National Bank of Springfield". The plan provides that title to the trust fund is vested exclusively in the trustee who is given broad powers to hold, invest, and reinvest the assets of the trust. Petitioner, by action of its board of directors, may remove the trustee with 30 days advance written notice. Under the terms of the plan, the plan administrator is the employer or persons employed by the employer. The plan administrator *49 is authorized to construe and interpret the plan, decide questions of eligibility, determine benefit payments and authorize the trustee to distribute benefit payments, and keep records on behalf of the plan. The amount of the benefit under the Association Plan is 14 times the lesser of $ 300,000 or the employee's annual compensation. The plan had two participating employees as of the end of fiscal years 1983 and 1984, and three participating employees as of the end of fiscal year 1985. The following benefits were computed for the two qualifying employees for fiscal year 1983: In the event of each employee's death, a death benefit of $ 695,464 for Ms. Patricia Reeves and a death benefit of $ 4,200,000 for Dr. Schneider. The benefits provided under the plan were funded in part by the purchase of life insurance policies, and in part by the Association Plan's assets. The assets held in trust under the plan are to be used "for the exclusive purpose of providing life and or other welfare-type benefits" to covered employees and the plan provides: at no time shall any part of the Trust Fund be used or diverted to purposes other than those for the exclusive benefit of Members, nor *50 shall any part of the net earnings or trust assets inure to the benefit of the Company or any private shareholder or individual other than through the payment of benefits provided by the Plan.
Furthermore, the plan provides that there shall be no reversion of assets to petitioner as follows: No part of the corpus or income of the Trust Fund shall revert to the Company or be used for, or diverted to, purposes other than for the exclusive benefit of Members and Beneficiaries entitled to benefits under the Plan.
The Association Plan also provides that "all contributions hereunder and all assets and earnings of the Trust are solely and irrevocably dedicated to the payments of benefits of the kind and type specified in the Plan or Plans adopted by the Company", with three exceptions. Under those exceptions, a contribution can be returned within 1 year if it has been paid "due to a good faith mistake of fact", or if qualification of the plan under section 501(c)(9) is denied, or if the deductibility of a contribution under section 162 is not allowed. Under its terms, the Association Plan can be amended by petitioner upon 15 days written notice. However, it provides that *51 no amendment: (1) Shall change the primary purpose of this Trust; (2) Shall permit, except as provided in section 6.3, any part of the Trust property to revert to the employer or to be used or diverted to purposes other than the exclusive benefit of Members and their beneficiaries; (3) Shall result in the forfeiture or reduction of the amount of benefit payable on account of or due to events occurring prior to such amendment; or (4) Shall change the rights, duties and liabilities of the Trustee under the Trust without written consent by the Trustee.
Section 6.3 is the limited provision referred to above, under which contributions can be returned to the employer within 1 year if they were paid by mistake of fact, if the plan is denied qualification as tax-exempt under section 501(c)(9), or if the employer is not allowed a deduction for the contribution under section 162. The Association Plan can also be terminated under certain specified circumstances, but it provides that assets remaining after the satisfaction of liabilities shall: (a) be applied to provide life, sick, accident or other benefits pursuant to criteria that do not provide for disproportionate *52 benefits to officers, shareholders or highly compensated employees; or (b) be distributed to Members on the basis of objective and reasonable standards which do not result in either unequal payments to similarly situated Members or in disproportionate payments to officers, shareholders or highly compensated employees.
Furthermore, the trust provides that any such distribution is to be made "in a manner consistent with the exempt status of this Trust under SECTION 501(c)(9)". On December 14, 1983, Dr. Schneider on behalf of petitioner, the plan administrator, filed an application for recognition of exemption under section 501(c)(9) regarding the tax-exempt status of the trust which funded the Association Plan. On August 30, 1984, respondent denied the application and concluded that the trust did not qualify for tax-exempt status pursuant to section 501(c)(9) because the net earnings of the association inured to the benefit of Dr. Schneider in violation of section 1.501(c)(9)-4(a), Income Tax Regs. Respondent based this conclusion upon the fact that: * * * Joel A. Schneider is the sole owner of the employer corporation and is entitled to approximately ninety-three percent *53 of the benefits under the plan. In addition, by reason of his ownership and control over the employer corporation, Joel A. Schneider has ultimate control over the continued existence of the trust.
After respondent denied the section 501(c)(9) tax-exempt status of the trust, petitioner did not exercise its right to void the Association Plan and no contributions reverted to petitioner. All three plans were operated in accordance with their provisions. There is no evidence that any assets from any of the plans were transferred or reverted back to petitioner. The plans incurred the following expenses during the years in issue: Trust Taxable Year Ended
6/30/83
6/30/84
6/30/85
Employee Benefit Plan
0
$ 2,200
$ 2,049
Educational Benefit Plan
0
952
822
Association Plan
$ 2,256
4,439
4,664
The contributions which petitioner made to each of the three plans were based upon actuarial computations made by an independent actuarial firm. During the years at issue, petitioner made the following contributions to each of the plans: Trust Taxable Year Ended
6/30/83
6/30/84
6/30/85
Employee Benefit Plan
$ 170,266
$ 202,000
$ 202,000
Educational Benefit Plan
98,767
40,000
20,000
Association Plan
136,118
136,000
145,683
Total
$ 405,151
$ 378,000
$ 367,683
*54 Petitioner treated the above contributions as ordinary and necessary business expenses and deducted the aggregate amount contributed in each year on its Federal income tax return. For fiscal year ending June 30, 1985, petitioner reported a net loss in the amount of $ 46,762. In his notice of deficiency, respondent disallowed the deductions which petitioner claimed in the aggregate amount of its contributions to the three plans in fiscal years 1983, 1984, and 1985. For fiscal year 1985, this adjustment had the effect of eliminating the net operating loss which petitioner had claimed in that year. The tax deficiency determined for fiscal year 1982, $ 1,587, is based solely upon the elimination of the net operating loss claimed for 1985. OPINION Petitioner established the three employee welfare benefit plans described above to provide death benefits, disability or termination benefits, and educational benefits to its employees. The issue for decision is whether petitioner's contributions to the plans during fiscal years 1983, 1984, and 1985 are allowed as deductions under section 162(a). Section 162(a) allows as a deduction all ordinary and necessary expenses paid or incurred *55 during the taxable year in carrying on any trade or business. There are five requirements for deductibility under section 162(a). The item must: (1) Be paid or incurred during the taxable year; (2) be for carrying on a trade or business; (3) be an expense; (4) be a "necessary" expense; and, (5) be an "ordinary" expense. Commissioner v. Lincoln Savings & Loan Association, 403 U.S. 345, 352 (1971). Petitioner contends that its contributions to the subject plans meet the above five requirements and are deductible under sections 162(a). Petitioner argues that it made all of the contributions to an independent trustee, that it could not recover any of the funds contributed, and that it did not retain a property interest in the amounts contributed or in the funds held in trust under any of the plans. Petitioner contends that the contributions served a business purpose and are similar to other employee benefits which are deductible. Finally, petitioner points out that the contributions were paid from current operations and they provide no direct or substantial benefit to any future period. In summary, petitioner argues that it has not created a lasting benefit *56 for itself but instead has irrevocably paid the funds over to the trusts for the benefit of its employees. Therefore, petitioner contends, all amounts are currently deductible. Respondent makes a 2-prong attack on the deductibility of the subject contributions. First, he contends that the contributions are not "ordinary" expenses because they "created a benefit or asset for petitioner lasting substantially beyond the close of the tax year in which those contributions were made". Therefore, in respondent's view, the contributions are capital expenditures and not currently deductible under section 162(a). The second prong of respondent's attack is his contention that the subject contributions constitute "prepaid expenses" which may not be currently deducted. Respondent's position is that petitioner is not entitled to deduct its contributions to any of the plans but that it can take a deduction at the time when benefits are paid under one of the plans to or on behalf of its employees. At the outset, we note that section 1.162-10(a), Income Tax Regs., first promulgated in 1958 and still in effect today, states as follows: Certain employee benefits. * * * Amounts paid or accrued *57 within the taxable year for dismissal wages, unemployment benefits, guaranteed annual wages, vacations, or a sickness, accident, hospitalization, medical expense, recreational, welfare, or similar benefit plan, are deductible under section 162(a) if they are ordinary and necessary expenses of the trade or business. However, * * * such amounts shall not be deductible under section 162(a) if, under any circumstances, they may be used to provide benefits under a stock bonus, pension, annuity, profit-sharing, or other deferred compensation plan of the type referred to in section 404(a).
Respondent does not question the fact that each of the three plans is an employee "welfare, or similar benefit plan" within the meaning of the above regulation. He does not argue that petitioner's contributions under the subject plans can be used to provide benefits under a stock bonus, pension, annuity, profit-sharing or other deferred compensation plan. Both parties agree that section 404(a) does not apply herein. Thus, in effect, respondent concedes that petitioner's contributions are currently deductible if they qualify under section 162(a) as ordinary and necessary expenses of a trade or *58 business. See generally Greensboro Pathology Associates, P.A. v. United States, 698 F.2d 1196 (Fed. Cir. 1982). We also note that petitioner's officers and directors intended each of the three plans to qualify under section 501(c)(9) as a voluntary employees' beneficiary association but that respondent does not concede that any of the three plans so qualified. However, the tax treatment of each of the trusts established under the subject plans is not at issue, and the parties agree that the deductibility of petitioner's contributions to the plans does not depend upon the treatment of the trusts. Furthermore, as a preliminary matter, we note the fact that the rules governing the timing of an employer's deduction for contributions paid or accrued to a welfare benefit fund were changed with the enactment of sections 419 and 419A by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 511, 98 Stat. 494, 854. The new rules apply to contributions paid or accrued after December 31, 1985, in taxable years of employer's ending after that date. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 511(e)(1), 98 Stat. 862. In general, sections 419 and 419A limit the *59 amount which an employer can deduct under section 162 for contributions to a welfare benefit fund to the fund's "qualified cost" for the taxable year. Sec. 419(b). For purposes of this case, it is pertinent to note that the "qualified direct cost" of a welfare benefit fund is the aggregate amount which would have been allowable as a deduction, if the employer provided the benefits directly to its employees and used the cash receipts method of accounting. Sec. 419(c)(3)(A). The statute deems a benefit to have been provided when it is "includible in the gross income of the employee". Sec. 419(c)(3)(B). We do not quarrel with the principles of law on which respondent relies. Certainly, if an expenditure results in the creation or enhancement of a separate and distinct asset owned by the taxpayer, then, we agree, the expenditure is not currently deductible. Commissioner v. Lincoln Savings & Loan Association, supra.Similarly, we agree that if an expenditure results in a substantial benefit to the taxpayer, as distinguished from an incidental benefit, which can be expected to produce returns to the taxpayer for a period of time in the future, then the expenditure *60 is deemed capital and cannot be currently deducted. See National Starch & Chemical Corp. v. Commissioner, 918 F.2d 426 (3d Cir. 1990), affg. 93 T.C. 67 (1989), cert. granted INDOPCO, Inc. v. Commissioner, 500 U.S.    , 59 U.S.L.W. 3769 (May 13, 1991). We disagree, however, with the manner in which respondent attempts to apply those principles in this case. He argues that petitioner's contributions to the subject plans are capital expenditures because a portion of the contributions to each plan was not "expended" to pay for benefits or plan expenses during the year and that portion will be available for use by the plan to provide benefits to petitioner's employees in later years. To that extent, respondent contends, the contributions created a benefit or asset for petitioner of indefinite duration. Respondent states as follows: In this case, petitioner's contributions to its plans were (to the extent not expended in the year contributed) capital in nature. More specifically, the unexpended portions of those contributions created a benefit or asset for the corporation of indefinite duration.
Respondent concedes *61 that "none of the plans allowed for the reversion of surplus assets to petitioner at termination". Nevertheless, he argues that petitioner retained an "economic advantage or benefit" by reason of its "right to amend the plans at any time to provide different or additional benefits to employees" and its "right to terminate the plans at any time and * * * to direct how the remaining assets will * * * be apportioned among plan participants". Respondent argues that in this manner, "petitioner retains substantial control over how, when, and for what purposes the unexpended assets of each plan will be dispersed [sic] to or for the benefit of participating employees". We have traditionally analyzed the deductibility of an employer's contributions to a welfare benefit plan by taking into consideration, among other things, both the degree of control which an employer retains over the plan and the degree to which the employees, as opposed to the employer, are benefited. For example, in Weil Clothing Co. v. Commissioner, 13 T.C. 873 (1949), we described the analysis made in several prior cases as follows: In Lemuel Scarbrough, 17 B.T.A. 317, a payment *62 into a sick benefit fund for employees of the taxpayer was held to be an ordinary and necessary business expense where the employer completely parted with control over the fund. In W. M. Ritter Lumber Co., 30 B.T.A. 231, 246-248, payments to employees' committees for welfare work among the employees, the employer having no control over the expenditure of the money, were held deductible as ordinary and necessary business expenses. In Gisholt Machine Co., 4 T.C. 699, a payment in 1941 into a retirement trust for the benefit of certain employees was held deductible under section 23 (a) as within reasonable compensation for their services. Although the employer named the trustees administering the trust, the employees had specified shares in the fund. In Surface Combustion Corporation, 9 T.C. 631, (on appeal, CA-6) the employer made contributions to profit-sharing trusts in which the employees had stated shares payable to them under certain contingencies, but which were forfeitable if they left the employment or were discharged for cause. The employer named the trustees to administer the fund and could modify the trust if *63 two-thirds of the beneficiaries consented. We held that the payment was deductible under section 23 (a) as reasonable additional compensation for services. [13 T.C. 877-878.]
As suggested above, if an employer completely parts with control over the contributions and they are paid to a fund, such as one providing sick benefits, which does not directly benefit the employer, then it has been held that the contributions represent ordinary and necessary business expenses. See Greensboro Pathology Associates, P.A. v. United States, supra.
On the other hand, an employer has not been permitted to deduct contributions to a plan when the degree of control which the employer retains over the plan is such that the employer does not actually relinquish control over the contributed funds and, thus, the rights purportedly conferred to its employees under the plan are "illusory". Citrus Orthopedic Medical Group, Inc. v. Commissioner, 72 T.C. 461 (1979). In that case, for example, we found that the employer could amend or terminate the plan at any time, and could require the return of all contributed funds. Similarly, we have *64 not permitted an employer to deduct contributions to a plan providing benefits which are of direct concern with the well-being of the employer, rather than its employees. Anesthesia Service Medical Group, Inc. v. Commissioner, 85 T.C. 1031, 1044-1055 (1985), affd. 825 F.2d 241 (9th Cir. 1987). In that case, the plan provided for the payment of malpractice claims of the employer's physician employees or for the purchase of malpractice insurance on their behalf. We found that the plan was directly concerned with the well-being of the employer, not the employees, because, under the doctrine of respondeat superior, the employer would ultimately be liable for malpractice committed by its employees. In this case, we agree with respondent's contention that the rights which petitioner retained to amend the plan and to terminate it give petitioner a measure of "control" over how, when, and for what purposes the unexpended assets of each plan will be dispersed. This is self-evident from the plans themselves. We also agree with respondent that petitioner will derive a future "benefit" from the unexpended assets in the plan. However, neither the "control" *65 retained by petitioner nor the "benefit" which petitioner will derive from the existence of the plans in the future, causes us to conclude that petitioner will realize a "direct and continuing economic benefit or advantage to petitioner of the sort contemplated by the capitalization doctrine", to use respondent's words. First, it is clear that, in the context of a plan providing traditional employee welfare benefits, such as the plans involved in this case, an employer does not necessarily retain too much control when it retains the right to alter or terminate the plan, as long as the funds in the plan may never revert to or inure to the benefit of the employer. See Greensboro Pathology Associates, P.A. v. United States, 698 F.2d 1196 (Fed. Cir. 1982); Moser v. Commissioner, T.C. Memo. 1989-142, affd. as to other issues 914 F.2d 1040 (8th Cir. 1990). Greensboro Pathology Associates, P.A. v. United States, supra, involved contributions to an educational benefit plan for the children of employees of a four physician professional corporation. The court held that the plan was a welfare benefit plan within *66 the meaning of section 1.162-10, Income Tax Regs., and was not a type of deferred compensation plan referred to in section 404(a). Respondent has conceded that point in the instant case. The court also found that the taxpayer's contributions were deductible under section 162(a). In so holding, the court stated as follows: The plan, unlike that involved in Citrus, is independently administered by a trustee whom the appellant [employer] does not control. The appellant [employer] retains no day-to-day control over the trust funds. The trust's monies may never revert to or inure to the benefit of the corporation. [6] [698 F.2d at 1203.]
*67 Similarly, in Moser v. Commissioner, supra, respondent had disallowed deductions claimed by the taxpayer, a corporation with three employees, for contributions to an employee welfare benefit plan. Respondent contended in that case, as he contends here, that the contributions created a capital asset or provided the employer with a substantial benefit extending beyond the end of the taxable year in which the contributions were made. We rejected respondent's argument that the employer retained control over the amounts contributed under the plan through its ability to effect amendments or termination of the plan. The fact that the corporation could effect amendments or termination, we held, was not determinative because "several provisions in the plan documents clearly prohibit the reversion of any funds to the employer" and the VEBA was operated in accordance with those plan provisions. Moser v. Commissioner, supra.
In this case, the contributions to each of the subject plans were made to an independent trustee, the Illinois National Bank of Springfield, Illinois, which held title to the assets in the plan and exercised day-to-day *68 control over those assets. The assets were held in trust to provide death benefits, disability or termination benefits, and educational benefits to petitioner's employees, and respondent concedes that "none of the plans allowed for the reversion of surplus assets to petitioner at termination". Thus, the rights which petitioner reserved to amend and terminate the subject plans are substantially different from those reserved by the employer in Citrus Orthopedic Medical Group, Inc. v. Commissioner, supra, under which the employer could obtain reversion of the funds, and are similar to the rights reserved by the employers in Greensboro Pathology Associates, P.A. v. United States, supra, and Moser v. Commissioner, supra, which permit the employer an element of flexibility. Second, the assets held in trust under each of the subject plans are dedicated to providing petitioner's employees with death benefits, disability or termination benefits, and educational benefits. Thus, petitioner's contributions to the plans directly benefit its employees, not petitioner. This case is unlike Anesthesia Service Medical Group v. Commissioner, supra, *69 in which the taxpayer's contributions protected the employer against the malpractice liability of its employees and, hence, were of primary benefit to the employer and not to the employees. Any future "benefit" which petitioner will derive from its contributions to the three plans is based on the expectation that its employees are more likely to remain loyal and perform to the best of their abilities if their economic needs are satisfied. This is an incidental or indirect benefit, such as referred to by the Supreme Court when it stated that "the presence of an ensuing benefit that may have some future aspect is not controlling". Commissioner v. Lincoln Savings and Loan Association, supra at 354. See Iowa-Des Moines National Bank v. Commissioner, 68 T.C. 872, 879 (1977), affd. 592 F.2d 433 (8th Cir. 1979). In Weil Clothing Co. v. Commissioner, 13 T.C. 873 (1949), we held that this benefit was not the type of "benefit" which should be capitalized: The respondent argues that the payment here should be treated as a capital investment rather than a deductible expense, as its benefits to petitioner's *70 employees are not confined to the taxable year, and may apply to employees subsequently hired. However, any such application would not be by the petitioner, as the fund was controlled by the employees. The payment did not result in the acquisition of an asset by petitioner, but actually reduced its resources. It was not a capital investment. While petitioner derived a benefit through the increased good will of its employees likely to result from the contribution, this is not a benefit which should be capitalized. See Elgin National Watch Co., 17 B.T.A. 339, affd., 66 Fed. (2d) 344. [13 T.C. at 897-880.]
Moreover, if the "benefit" which petitioner derives in this case, i.e., the good will of employees, were enough to require capitalization of petitioner's contributions, then every contribution made by an employer to an employee benefit plan would have to be capitalized and none of them could qualify as an "ordinary" expense. The second prong of respondent's attack on the deductibility of the subject contributions is his argument that they are nondeductible prepaid expenses to the extent that they were not actually expended *71 by the plans during the current year in the form of benefits or plan expenses. Respondent relies on Grynberg v. Commissioner, 83 T.C. 255 (1984), and argues that petitioner has failed to prove that it meets the three requirements for the deduction of prepaid expense which are set forth in that opinion. Petitioner argues that respondent misconstrues the nature of a "prepaid expense". Petitioner contends that its contributions to the subject welfare benefit plans are not prepaid expenses and are deductible without regard to whether they meet the three requirements set forth in Grynberg v. Commissioner, supra. Petitioner contends that, in any event, its contributions to the subject plans meet those requirements. In this regard, it argues that there was a "substantial business reason" for making the subject contributions and that the contributions did "not cause a material distortion" in petitioner's taxable income. We agree with petitioner's position that the subject contributions are not prepaid expenses. Thus, it is unnecessary for us to consider whether they also qualify under the requirements set forth in Grynberg v. Commissioner, supra. *72 Respondent treats the subject contributions like an advance payment of management fees to be rendered in a later taxable period, such as was at issue in Bonaire Development Co. v. Commissioner, 76 T.C. 789 (1981), affd. 679 F.2d 159 (9th Cir. 1982). In that case, we concluded that the prepayment of the management fees was not an ordinary and necessary expense and we noted, "an advance payment by a cash basis taxpayer of an item which he was not obligated to pay until a later time has been held not to be an ordinary and necessary business expense". 76 T.C. at 795-796. Respondent also relies on other cases in which we have disallowed, as a current deduction, prepayments of rent for a later year, e.g., Keller v. Commissioner, 725 F.2d 1173 (8th Cir. 1984), affg. 79 T.C. 7 (1982); Grynberg v. Commissioner, supra, and payments to purchase feed for livestock in excess of the amount to be consumed during the current year, e.g., Packard v. Commissioner, 85 T.C. 397, 422-434 (1985); Owens v. Commissioner, 64 T.C. 1 (1975), affd. in part, *73 revd. in part 568 F.2d 1233 (6th Cir. 1977). Unlike the payments which are the subject of the cases on which respondent relies, the evidence in this case supports petitioner's contention that its contribution to each plan for a particular year relates only to the year in which the payment was made. None of the plans impose an obligation on petitioner to make contributions in later years and, thus, there was no definite and determinable expense obligation for petitioner to prepay. Moreover, each of the plans provides specified benefits for an employee's welfare should the need arise. The contributions which petitioner made in each of the subject years were computed by an independent actuary in an amount necessary to fund the plan for that year. These payments do not constitute prepayments for future expenses, since at the time of payment there was no way of knowing when the need would arise. In Texas Instruments Inc. v. United States, 551 F.2d 599 (5th Cir. 1977), affg. in part and revg. in part 407 F. Supp. 1326 (N.D. Tex. 1976), a similar argument was advanced that the taxpayer's contributions to its employee pension plans *74 were nondeductible prepaid expenses. The Fifth Circuit rejected the argument and stated as follows: Generally, an expense is considered prepaid if it is paid in a taxable year prior to the taxable year in which the benefits therefrom are received. The nondeductibility of a prepaid expense is based on the assumption that an expense in a fixed amount can be directly associated with a benefit to be received in a future year. Paying a worker so many dollars per hour is a simple closed-end business transaction. Contrast this with a plan to pay a 21 year old worker a pension when he retires. Differences in life expectancies, salaries' earning rates, inflation and a host of other factors doom simplistic answers to uselessness. In the pension funding area, many present benefits cannot be objectively gauged, all benefits will be received by employees in the future, and the calculation of the annual pension contribution is determined by what actuarial computation is used.
Texas Instruments Inc. v. United States, supra at 604. The same is true in the case of the welfare benefit plans involved in the instant case. A final point should be noted. Respondent's *75 position in this case is that petitioner's contributions to the subject welfare benefit plans are not deductible until paid out by the plans in the form of benefits or plan expenses. As mentioned above, the statute was amended by the enactment of sections 419 and 419A to bring about that result in the case of contributions made after 1985. Congress made that change because, according to the House Report, it believed "that the current rules under which employers may take deductions for plan contributions far in advance of when the benefits are paid allows excessive tax-free accumulation of funds". H. Rept. 98-432 (Pt. 2), 98th Cong. 2d Sess. at 1275 (1984). Similarly, the Conference Report states that under "present law", the law applicable to this case, "An employer's contribution to a fund that is a part of a welfare benefit plan may be deductible in the year it is made rather than at the time the benefit is provided". H. Conf. Rept. 98-861, at 1154 (1984), 1984-3 C.B. (Vol. 2) 1, 408. We believe, as petitioner contends, that Congress would not have enacted sections 419 and 419A to accomplish a tax policy objective which was already implicit in the definition *76 of the term "ordinary". Nor can we reconcile respondent's position in this case with the statements in the legislative history of the Deficit Reduction Act of 1984, quoted above, that before sections 419 and 419A were enacted, employers could "take deductions for plan contributions far in advance of when the benefits were paid". H. Rept. 98-432 (Pt. 2), 98th Cong. 2d Sess. at 1275. For the reasons discussed above, we find that petitioner's contributions to its employee benefit plans were properly deducted pursuant to section 162(a) and section 1.162-10(a), Income Tax Regs. It follows from that finding that petitioner did not understate its Federal income tax liability for any of the years at issue by deducting its contributions to the three employee welfare benefit plans. Accordingly, petitioner is not liable for the addition to tax for substantial understatement of its Federal income tax pursuant to section 6661, with respect to those deductions. Because of concessions by the parties, Decision will be entered under Rule 155. Footnotes
6. We realize the appellant [employer] could at any time terminate or alter the plan although the monies of the trust could never revert to or inure to the appellant's benefit. This minimal retention of the control is not sufficient to make the benefits of the plan in any way illusory. Employers need to retain rights to alter or terminate plans to meet the changing needs of the employees and employer. This flexibility may be required with numerous types of plans including the medical, vacation and other welfare benefit plans specified by regulation. We hold that the critical inquiry is whether the funds in the plan may ever revert to or inure to the benefit of the company.↩