**NATIONAL STARCH AND CHEMICAL CORPORATION, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 89–1923.

United States Court of Appeals, Third Circuit.

Argued March 16, 1990.

Decided Nov. 13, 1990.

As Amended Nov. 28, 1990.

Richard J. Hiegel (argued), Rory O. Millson, Lewis R. Steinberg, Cravath, Swaine & Moore, Richard H. Walker, Geoffrey R.S. Brown, Cadwalader, Wickersham & Taft, New York City, for appellant.

Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Gilbert S. Rothenberg, Bruce R. Ellisen (argued), Tax Div., Dept. of Justice, Washington, D.C., for appellee.

Before: SLOVITER, BECKER, and STAPLETON, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

This is an appeal by National Starch and Chemical Corporation (National Starch) from a decision of the Tax Court affirming the disallowance by the Internal Revenue Service (IRS) of the investment banking fee, legal fees and related expenses incurred by National Starch's Board of Directors in deciding whether to acquiesce in a takeover by Unilever United States, Inc. National Starch contends that these were ordinary and necessary business expenses deductible under section 162(a) of the Internal Revenue Code. The Tax Court agreed with the Commissioner of Internal Revenue that all of the fees were nondeductible capital expenditures. This appeal presents, as far as we can tell, an issue of first impression.

### I. *Facts and Procedural History*

The facts are largely undisputed and are in the record as a result of a stipulation between the parties.

In 1977, Unilever approached National Starch, one of Unilever's suppliers, to gauge its interest in being the target of a friendly takeover. All of the stock of Unilever United States, Inc. is owned by Unilever N.V. (jointly referred to as Unilever),

a publicly held Netherlands Corporation.[1] Unilever was interested in increasing its United States revenues relative to its overall revenues.

Unilever expressed its interest in National Starch to, *inter alia*, Frank Greenwall, a member of National Starch's Board of Directors, who along with his wife was the largest stockholder, holding approximately 14½ percent of the stock. The Greenwalls decided to sell their shares to Unilever if the transaction could be arranged to be tax-free to them so that they could defer capital gains for estate planning purposes. Unilever, which was interested only in a friendly takeover, would proceed only if the Greenwalls were willing to sell their shares.

To satisfy the Greenwalls, the merger was arranged as a "reverse subsidiary cash merger" under which Unilever created a subsidiary, National Starch and Chemical Holding Company (Holding),[2] which offered to either purchase the shares of National Starch's shareholders with money contributed by Unilever or exchange them for preferred stock of Holding. Subsequently, this arrangement received the desired ruling from the Internal Revenue Service that shareholders who exchanged National Starch stock for Holding stock could do so without adverse tax consequences.

When the plan was presented to National Starch's Board of Directors for consideration, the corporation's legal counsel advised the directors that they had a duty to ensure that the transaction "would be fair to the shareholders and that that would involve valuations of the company." App. at 91. Counsel suggested "as a practical matter that it would be extremely useful for the board to have a firm of outside independent investment bankers ... to assist in the valuations of the company to ensure fairness of any transaction," *id.*, and that it was also wise from a legal standpoint in carrying out the Board's fiduciary duties.

App. at 92. When it appeared likely that a favorable ruling would be forthcoming from the IRS, National Starch engaged Morgan Stanley & Co. (Morgan Stanley) to do a preliminary analysis, review National Starch's alternatives, make a valuation judgment after studying National Starch, render a fairness opinion, and coordinate the technical details of the merger.

Morgan Stanley prepared and delivered a report to the Board on the fairness of the offer. Unilever had originally proposed a price of $65 to $70 for each share of National Starch, which Morgan Stanley concluded was fair. Unilever thereafter offered $70 a share. National Starch's management suggested a price of $80 a share, which Morgan Stanley relayed to Unilever on the Board's behalf. Morgan Stanley thereafter reported back a Unilever offer of $73.50 a share, the price ultimately agreed upon.

After the sale of the stock, National Starch retained its former management, and it did not materially increase the sale of its products to Unilever. The management at National Starch viewed the transaction as "swapping approximately 3500 shareholders for one." App. at 141. As a matter of administrative convenience, it changed its charter to eliminate its authorized and unissued preferred stock and decreased its authorized common stock to 1,000 shares.

National Starch's tax return for the year that ended August 15, 1978 (the date of acquisition) treated the $2,225,586 Morgan Stanley fee as a deduction for an ordinary and necessary business expense under section 162(a) of the Internal Revenue Code. The IRS disallowed the deduction and issued a notice of deficiency in the amount of $1,068,281. National Starch filed a petition in the United States Tax Court contesting the disallowance. It also claimed a refund, asserting that it had overpaid its 1978 tax-

---

1. Unilever United States, Inc. is a holding company whose principal subsidiaries in 1977 were Lever Brothers Co. and Thomas J. Lipton, Inc., both of which manufacture and sell primarily foods and detergents.

2. Holding then created a subsidiary, NSC Merger (Merger), which was immediately merged into National Starch. The government concedes that this merger was "an incidental aspect of the transaction that should be disregarded." Brief for Appellee at 18 n. 7.

es in the amount of $706,079 because it had not deducted, and was entitled to deduct, ancillary expenses which included its attorneys' fees, costs associated with the proxies, and the SEC fees it incurred with respect to the merger plan.[3] The Tax Court upheld the disallowance by the IRS. 93 T.C. 67 (1989).

The Tax Court rejected the IRS' contention that the expenditures were nondeductible because they were incurred incident to a recapitalization, merger, or reorganization, concluding essentially that the form and structure of the transaction was selected primarily for administrative convenience. On the other hand, the Tax Court concluded that these were nondeductible capital expenditures because National Starch's directors determined that it would be in National Starch's "long-term interest to shift ownership of the corporate stock to Unilever" and "[t]he expenditures in issue were incurred incident to that shift in ownership...." *Id.* at 75. Accordingly, it believed those expenditures "lead to a benefit 'which could be expected to produce returns for many years in the future.'" *Id.* (quoting *E.I. du Pont de Nemours and Co. v. United States,* 432 F.2d 1052, 1059 (3d Cir.1970)). Such a benefit is "capital in nature" because its purpose has to do with the corporation's betterment for the indefinite future. *Id.* The court noted that National Starch's 1978 annual report stated that it would benefit from the availability of Unilever's enormous resources, and that Morgan Stanley's report stated that National Starch's affiliation with Unilever would create the opportunity for synergy. *Id.* at 76.

The Tax Court rejected National Starch's argument that the Supreme Court's decision in *Commissioner v. Lincoln Savings & Loan Ass'n,* 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971), created a new test to determine deductibility under section 162(a) that looks to whether a separate and distinct additional asset is created, rather than the length of the period of the benefits. 93 T.C. at 77. It also rejected National Starch's contention that the dominant as-

pect of the transaction was the fiduciary duty the Board of Directors owed to the shareholders and not the transfer of the stock, finding instead that "the dominant aspect was the transfer of petitioner's stock for the benefit of [National Starch] and its shareholders." *Id.* at 78.

National Starch has appealed from the Tax Court's decision. We have jurisdiction pursuant to 26 U.S.C. § 7482. Our review of the Tax Court's construction of the Code is plenary; we review its factual findings and inferences for clear error. *Pleasant Summit Land Corp. v. Commissioner,* 863 F.2d 263, 268 (3d Cir.1988).

## II. *Ordinary and Necessary Business Expenses*

### A. *Effect of Lincoln Savings*

■ The issue before us is whether National Starch's expenditures for investment banking and legal fees can be deducted under section 162(a) of the Internal Revenue Code as ordinary and necessary business expenses or whether they must be capitalized under section 263. Section 162 provides: "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business...." 26 U.S.C. § 162(a) (1988). This provision must be interpreted in tandem with section 263, which prohibits deductions for "[a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." 26 U.S.C. § 263(a)(1) (1988).

The Supreme Court has enumerated five separate requirements for deductibility under section 162(a). The item must (1) be paid or incurred during the taxable year (2) for carrying on any trade or business, and (3) be an expense (4) that is "necessary" and (5) "ordinary." *Commissioner v. Lincoln Savings & Loan Ass'n,* 403 U.S. at 352, 91 S.Ct. at 1898. Only the "ordinary expense" requirement is in dispute here. The Court has stated, in somewhat circular fashion, that the principal function of the

---

**3.** A refund in excess of $257,444 is barred by the statute of limitations.

term "ordinary" is to distinguish between expenses currently deductible and capital expenditures which, if deductible at all, must be amortized over the useful life of the asset. *See Commissioner v. Tellier,* 383 U.S. 687, 689–90, 86 S.Ct. 1118, 1119–20, 16 L.Ed.2d 185 (1966).

Tax deductions are a matter of legislative grace. *See Interstate Transit Lines v. Commissioner,* 319 U.S. 590, 593, 63 S.Ct. 1279, 1281, 87 L.Ed. 1607 (1943). Thus, the burden is on the taxpayer to show that the expenses are deductible. *See E.I. du Pont de Nemours and Co. v. United States,* 432 F.2d 1052, 1059 (3d Cir.1970).

Before 1971, this court held that when an expenditure resulted in a benefit to the taxpayer "which could be expected to produce returns for many years in the future," the expenditure was deemed capital and therefore nondeductible. *Id.* (legal expense in devising plan to satisfy antitrust decree which involved restructuring of the enterprise not deductible); *see also McDonald v. Commissioner,* 139 F.2d 400, 401 (3d Cir. 1943) (campaign expenses not deductible as ordinary expenses because benefit sought to be derived putatively spread over ten-year term), *aff'd,* 323 U.S. 57, 65 S.Ct. 96, 89 L.Ed. 68 (1944).

National Starch argues that the legal standard employed by the Tax Court in this case, which looked to the presence of a future benefit to determine that the expenditures were ordinary and necessary business expenses, was specifically rejected by the Supreme Court in *Commissioner v. Lincoln Savings & Loan Ass'n.* It argues that *Lincoln Savings* established a new and exclusive test for distinguishing between deductible expenses and nondeductible capital expenditures under which expenses are not to be capitalized unless they result in the creation or enhancement of a separate and distinct asset.

The issue before the Supreme Court in *Lincoln Savings* was whether an additional premium required by federal statute to be paid by a savings and loan association to the Federal Savings and Loan Insurance Corporation (FSLIC) was deductible as an ordinary and necessary business expense under section 162(a). The Court accepted the distinction made by the IRS between premiums paid by Lincoln for the FSLIC's Primary Reserve, the general reserve for the expenses and insurance losses in which the insured institutions had no property interest, and its Secondary Reserve, on which those institutions were credited a return and in which they owned a pro rata share to be refunded upon termination of their insured status. Premiums paid for the Primary Reserve were deductible as ordinary and necessary expenses, but the Court held that payments to the Secondary Reserve were nondeductible capital expenditures. The Court stated:

> [w]hat is important and controlling ... is that the ... payment serves to create or enhance for Lincoln what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature and not an expense, let alone an ordinary expense, deductible under § 162(a) in the absence of other factors not established here.

403 U.S. at 354, 91 S.Ct. at 1899.

In the course of determining that the expenses were capital, the Court stated that "the presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year." *Id.* National Starch relies on this language to support its argument that expenditures which do not create or enhance a separate and distinct asset are to be treated as deductible ordinary expenditures.

We do not read *Lincoln Savings* as broadly as does National Starch. The language upon which National Starch relies does not create a new bright-line test. Although the opinion clearly holds that a payment that creates or enhances a separate asset is capital in nature, *see id.,* it does not necessarily follow that if no asset is created the expenditure is not capital in nature. The government aptly describes this argument as concluding that "because something made out of glass is fragile, all

things fragile must be made out of glass." Brief for Appellee at 28 n. 13.

There is nothing in the *Lincoln Savings* opinion that announces a new test for the lower courts to apply or suggests that the Court intended to create a new standard applicable irrespective of the factual context. Although it is clear that the Court viewed the creation or enhancement of a separate and distinct asset as "important and controlling" in requiring the expense to be capitalized, the absence of such an asset is not addressed in the opinion. Further, although an incidental future benefit would plainly not be controlling, the Court does not suggest that the presence of a significant future benefit is not a legitimate factor to consider in determining deductibility.

If National Starch's interpretation were correct, the Court would have implicitly overruled without discussion its earlier precedent in which it held that expenses should be capitalized even though no separate asset was created or enhanced. *See, e.g., Deputy v. du Pont,* 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940) (holding nondeductible carrying charges on short sales of stock to corporation's executives made by shareholder to assist the corporation in preserving his investment). In fact, in *Lincoln Savings,* 403 U.S. at 353, 91 S.Ct. at 1898, the Court cited with approval *Welch v. Helvering,* 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933), a case holding that payments by a former officer of the corporation's discharged debts to strengthen his own credit and professional standing were capital outlays, even though there was no separate and distinct asset involved. Thus, the *Lincoln Savings* opinion itself undermines National Starch's interpretation.

Finally, in cases decided after *Lincoln Savings,* the Court has used tests other than the separate and distinct asset test to determine whether expenditures should be capitalized. For example, in *United States v. Mississippi Chemical Co.,* 405 U.S. 298, 92 S.Ct. 908, 31 L.Ed.2d 217 (1972), decided the year after *Lincoln Savings,* the Court held that expenses associated with the acquisition of stock of the Bank of Coopera-

tives established by the Farm Credit Act of 1933 should be capitalized without making reference to any so-called *Lincoln Savings* test. Had it viewed *Lincoln Savings* as representing a radical shift and a new bright-line test for capitalization, it is unlikely that it would have ignored such a test the following year. Instead, the Court cited the *Lincoln Savings,* precedent as support for its conclusion that "[s]ince the security is of value in more than one taxable year, it is a capital asset ... and its cost is nondeductible." *Id.* 405 U.S. at 310, 92 S.Ct. at 915.

National Starch contends that every Court of Appeals that has faced this issue in the last eighteen years has held that where the expenses did not create or enhance a separate and distinct asset, the expenses were allowed as deductible under Section 162(a). Some Courts of Appeals have indeed construed *Lincoln Savings* to have created a new standard such as that proffered by National Starch. *See, e.g., Briarcliff Candy Corp. v. Commissioner,* 475 F.2d 775, 782 (2d Cir.1973) (*Lincoln Savings* "brought about a radical shift in emphasis" and directs the inquiry to whether the expenditures created or enhanced what was essentially a separate and distinct asset); *see also NCNB Corp. v. United States,* 684 F.2d 285 (4th Cir.1982) (en banc) (where expenditures of bank and its parent for metro studies, feasibility studies, and application to the Comptroller of the Currency do not create or enhance separate and identifiable assets but instead are used by parent to continually evaluate its market position, expenditures are ordinary and necessary).

Of course, the determination whether an expenditure is ordinary or capital is fact-specific. 6 Mertens, Law of Federal Income Taxation § 25.27 (1988). Analytically inapposite are those cases which, while reading *Lincoln Savings* differently than we do, found that there was in fact a separate asset which required the capitalization of expenditures. *See, e.g., Central Texas Savings & Loan Ass'n v. United States,* 731 F.2d 1181 (5th Cir.1984). Moreover, the cases cited by National Starch that involved the treatment of start-up

costs for expansion projects of banks, *see, e.g., Colorado Springs Nat'l Bank v. United States,* 505 F.2d 1185 (10th Cir.1974) (initial costs for computers, credit checks, and promotional activities in connection with participation in credit card system), are distinguishable. Banks, the *NCNB* court noted, are "unique" because a substantial portion of their assets must be readily available as cash to meet depositors' claims, and their books must accurately reflect their liquidity position. 684 F.2d at 293. Therefore, it found that the requirement by the Comptroller of the Currency that national banks treat such start-up costs as current expenses was presumptively controlling, but noted that the conservative accounting policy applicable to banks differed from that applicable to certain other federally regulated industries. *Id.* at 292.

Furthermore, at least three circuits continue to look to whether an ensuing benefit was created to determine whether the expense was ordinary and necessary. *See Central Texas Savings,* 731 F.2d 1181 (5th Cir.1984); *Iowa–Des Moines Nat'l Bank v. Commissioner,* 592 F.2d 433 (8th Cir.1979); *Colorado Springs Nat'l Bank,* 505 F.2d 1185 (10th Cir.1974).

In any event, our reading of the Supreme Court cases leads us to conclude that no one factor alone can control this complex decision. *See Colorado Springs Nat'l Bank,* 505 F.2d at 1192 ("[w]e find no statutory, regulatory, or decisional test which is dispositive. The issue [of the treatment of the challenged items] must be determined on the facts presented in the novel situation before us."). As Justice Cardozo noted in his oft-quoted statement about the ordinary and necessary determination:

> [h]ere ... the decisive distinctions are those of degree and not kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle.

*Welch,* 290 U.S. at 114–15, 54 S.Ct. at 9, quoted in *Lincoln Savings,* 403 U.S. at 353, 91 S.Ct. at 1898.

We conclude that although the presence of a separate and distinct asset is sufficient to treat an expenditure creating or enhancing that asset as capital, the lack of such an asset alone does not necessarily mean that an expenditure is ordinary and necessary under section 162(a). We turn, therefore, to consider the appropriate treatment of National Starch's payments, a particularly difficult inquiry here because the expenditures at issue resulted in neither a tangible asset nor a readily identifiable intangible asset. *See Ellis Banking Corp. v. Commissioner,* 688 F.2d 1376, 1379 n. 7 (11th Cir.1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3537, 77 L.Ed.2d 1388 (1983).

### B.  Treatment of National Starch's Expenses

■ Notwithstanding National Starch's protestations to the contrary, the common characteristic of expenses that have been found to be capital, in fact the *sine qua non* of capitalization, is the presence of a not insignificant future benefit that is more than merely incidental. The Court of Appeals' decision reversed in *Lincoln Savings* had failed to recognize that such a benefit always ensues when the expenses are used to create or enhance a capital asset. However, even post-*Lincoln Savings* cases acknowledge that the period of the benefit produced by the expenditure "remains a prominent, if not predominant, characteristic of a capital item." *Central Texas Savings,* 731 F.2d at 1183. As stated in *Ellis Banking,* "[t]he courts have uniformly interpreted [section 263] as denying a deduction for the cost of any long-lived asset." 688 F.2d at 1379 n. 5. Moreover, as we previously noted, the Supreme Court itself considered the length of time a security would be of value to the taxpayer in concluding that its acquisition costs were not deductible. *Mississippi Chemical,* 405 U.S. at 310, 92 S.Ct. at 915.

In this case, the Tax Court held that the expenditures were not deductible in light of its determination that National Starch's di-

rectors concluded that it would be in the corporation's "long-term interest to shift ownership of the corporate stock to Unilever." 93 T.C. at 75. The Tax Court found that the transaction provided at least two inherently permanent benefits to National Starch: (1) the availability of Unilever's enormous resources, and (2) the opportunity for synergy created by Unilever's affiliation with National Starch. *Id.* at 76. These are factual findings of the Tax Court which we may not overturn unless clearly erroneous. *See Pleasant Summit Land Corp.*, 863 F.2d at 268.

In its discussion of the long-term benefits to National Starch as a result of the affiliation with Unilever, the Tax Court stated that "the very availability of the resources of Unilever was an immediate, as well as a long-term, benefit because it broadened [National Starch's] opportunities." 93 T.C. at 76–77. There is ample support in the record for this finding. National Starch had assets in 1976, the year before Unilever's approach, which were in excess of $241 million, App. at 373, and its operating income was $48 million. App. at 372. Unilever was gargantuan in comparison. It had combined assets in 1976 worth close to five and a half billion dollars, App. at 667, and its operating profit was in excess of one billion dollars. App. at 665.

National Starch recognized that Unilever's sheer wealth provided it with a significant benefit. National Starch's 1978 Annual Progress Report stated that, "We will benefit greatly from the availability of Unilever's enormous resources, especially in the area of basic technology." App. at 391. Although this was written after the takeover, there is no reason why it did not equally represent the view of the Board of Directors in agreeing to the takeover.

Of additional significance to the finding of long-term benefit was the Tax Court's subsidiary finding that even though there is no evidence of an immediate benefit from the affiliation, it created the opportunity for synergy. 93 T.C. at 76. National Starch primarily produces specialty starches, adhesives and related chemical products sold to a large number of industrial users

for use in manufacturing a wide variety of consumer products and product packaging. App. at 608–14. Unilever describes itself as "one of the dozen largest businesses in the world by turnover—and the largest in consumer goods." App. at 415. The larger part of Unilever is in branded and packaged consumer goods: mainly foods, detergents, and toilet preparations. Significantly, Unilever listed other "important" activities as including chemicals, paper, plastics and packaging. *Id.*

It was undisputed that prior to the affiliation National Starch sold its products to Unilever and has continued to do so thereafter. App. at 142. National Starch emphasizes that there has been no material increase in the volume of such sales, but the Tax Court noted that "[t]he lack of benefits in the short term does not imply their absence in the long term, especially given the time it takes to plan and implement significant changes in a corporation's operations." 93 T.C. at 76.

Although Ned Bandler, Unilever's senior vice-president, testified there was no synergy "in the classic sense," App. at 70, this self-interested testimony may be discounted because it was in his company's interest to minimize the tax liabilities of National Starch. *See Riley v. General Mills, Inc.*, 346 F.2d 68, 72 (3d Cir.1965). Moreover, Bandler admitted in the very same sentence that National Starch "was not a business that was alien to Unilever's activities." App. at 70.

Finally, as emphasized by the Tax Court, Morgan Stanley reported that the National Starch "[m]anagement also feels that some synergy may exist with the Unilever organization given a) the nature of the Unilever chemical, paper, plastics and packaging operations ... and b) the strong consumer products orientation of Unilever United States, Inc." App. at 624–25. National Starch's managers reported this view to Morgan Stanley before the tax consequence of the transaction was at issue. There is thus adequate evidence to support the Tax Court's findings that both Unilever's enormous resources and the possibility of synergy arising from the transaction

served the long-term betterment of National Starch, and they are not clearly erroneous.

As an additional reason for nondeductibility, the Commissioner proposes that we adopt the rule that "[a ]ny transaction in which a corporate taxpayer is transformed from a publicly-held corporation to a one-shareholder corporation involves an effective change in the taxpayer's corporate structure that will benefit future operations," and therefore expenses incurred with respect to such an ownership shift are capital expenditures. Appellee's Brief at 21–22 (emphasis in original). The Tax Court did not reach this issue. There is some plausibility in the Commissioner's argument that the elimination of the risk of proxy fights and shareholders' derivative suits, as well as of the costs of annual filings with the SEC and the solicitation of proxies, are long-term benefits arising from the radical change in the corporate enterprise which will last for the indefinite future. However, we need not decide whether to accept the absolute rule sought by the Commissioner. In this case, more than a mere change in corporate ownership was effected. Because the transaction entailed the affiliation of National Starch with Unilever which, as we have held above, sufficed to create the requisite long-term benefit, we will leave for another case consideration whether the benefits of restructuring ownership alone would be sufficient to require capitalization of the fees pertinent thereto.

On the other hand, it is important to note that the Board of Directors was motivated, at least in part, by concern for the future development of National Starch in the event of the death of the Greenwalls, the company's largest stockholders, who were ages 79 and 81 at that time. Oscar M. Reubhausen, Chairman of the Board of National Starch at the time of this litigation, testified that he told Morgan Stanley that the "estates problems" concerning the Greenwalls were "overhanging the market" and represented a "question mark— 'for National Starch Corporation for the future.'" App. at 203. He thus viewed the Unilever offer as a "particular opportu-

nity put before National Starch." App. at 203–04.

Indeed, Morgan Stanley referred to that very concern in a letter to the Board summarizing its assignment. It stated that, "We understand that National Starch is interested in having Morgan Stanley review its strategic alternatives within the context both of the longer term situation of a 15% equity ownership in National Starch which at some point will be transferred from its present individual 'founding' owners and of an evaluation of an immediate proposed business combination involving Unilever." App. at 597. It is thus evident from the record that the National Starch directors viewed the Unilever offer as a transaction that would promote the long-term betterment of the corporation.

In addition, the fact that the Tax Court rejected the Commissioner's argument that the transaction was essentially a reorganization under section 368(a)(1)(B), for which expenditures must be capitalized, does not preclude consideration of the general rationale behind requiring capitalization of expenses for restructuring. As explained by Justice Blackmun, writing as a circuit judge (who, coincidentally, also authored *Lincoln Savings* ), reorganization expenses are treated as capital because they relate to the corporation's operations and betterment into the indefinite future, as distinguished from income production or other current needs. *See General Bancshares Corp. v. Commissioner,* 326 F.2d 712, 715 (8th Cir.1964); *see also El Paso Co. v. United States,* 694 F.2d 703, 709 (Fed.Cir. 1982) (expenses of "conception and implementation" involved in "a statutory reorganization ... are generally to be capitalized on the theory that the altered capital structure will provide a future business benefit of intermediate duration"); *McCrory Corp. v. United States,* 651 F.2d 828, 832 (2d Cir.1981) (reorganization expenditures, like organization expenditures, contribute to the creation of an intangible long-term asset—a change in the corporate structure for the benefit of future operations).

If capital expenditures were immediately deductible, the taxpayer's income would be distorted both in the current year and in later years when the benefits are in fact

received. This policy is reflected in section 263 which expressly precludes deductions for permanent "betterments" made to increase the value of any property. In line with this analysis, the court in *Ellis Banking* held that expenses made in connection with the decision to acquire stock of another corporation were not immediately deductible because to do so would understate current net income. 688 F.2d at 1379 (function of capitalization rules is to achieve accurate measure of net income by avoiding the understatement of current income associated with immediate deductibility); *see also States Steamship Co. v. Internal Revenue Serv.*, 683 F.2d 1282, 1284 (9th Cir.1982) (disallowing "substantial tax windfall" taxpayer sought "by bunching all the excess depreciation of three years into one year").

Although National Starch notes correctly that the fees and expenses at issue are not susceptible to depreciation or amortization because the benefit to the company has no ascertainable useful life, other courts have also concluded that section 263 requires denial of immediate deductibility in comparable situations. *See, e.g., Mills Estate v. Commissioner*, 206 F.2d 244, 246 (2d Cir. 1953) (costs of corporate reorganization not deductible even though intangible asset of "altered corporate structure" was not depreciable). In this respect, the expenses are analogous to the treatment of goodwill which is neither deductible nor depreciable until the business is sold, even though the benefits (increased profits) are obtained throughout the life of the business. *See* 5 Mertens, Law of Federal Income Taxation § 23A.141 (1985); *see also Thrifticheck Services Corp. v. Commissioner*, 287 F.2d 1 (2d Cir.1961).

Finally, we consider whether the expenditures are deductible merely because they may have been necessary under Delaware law for the Board members to satisfy their fiduciary obligation to the shareholders. Precedent suggests otherwise. The Court in *Lincoln Savings* held that additional premium payments must be capitalized even though the governing statute required their payment by the taxpayer. 403 U.S. at 359, 91 S.Ct. at 1901. Similarly, in *du Pont*, 432 F.2d at 1059, we stated that

"[t]he fact that the expenditures were involuntary ... does not negative a requirement that they be capitalized, if they were in fact capital expenditures." *See also Woolrich Woolen Mills v. United States*, 289 F.2d 444, 448 (3d Cir.1961) ("The involuntary nature of the expenditure ... does not render deductible as expense an item which would otherwise be non-deductible as capital.").

In sum, we conclude that the Tax Court's finding that the opportunities that arose from the friendly takeover by Unilever created a long-term benefit to National Starch was not clearly erroneous. Its conclusion that the Morgan Stanley consulting fee, legal fees, and other related expenses incurred by National Starch are not deductible under section 162(a) of the Code is consistent with the general principles usually applied by courts in analyzing the deductibility or capitalization of corporate expenses.

### III. *Conclusion*

For the reasons set forth above, we will affirm the decision of the Tax Court.