VICTORY MARKETS, INC. AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11276–90.      Filed December 23, 1992.

*Michael J. Sarofeen* and *Thomas S. Brett,* for petitioner.
*Randall P. Andreozzi,* for respondent.

OPINION

GERBER, *Judge:* Respondent determined deficiencies in Federal income tax due from petitioner for its 1980, 1983, and 1984 taxable years in the amounts of $998, $184,099,

and $63,320, respectively. The deficiencies determined result from adjustments respondent made disallowing net operating loss carrybacks from petitioner's short taxable years ending July 8, 1986, and December 27, 1986. In its short taxable year ended July 8, 1986, petitioner deducted $571,544 for professional services in connection with an unsolicited take-over offer. Petitioner has accepted as correct all of respondent's adjustments except for those related to expenses for professional services. Respondent disallowed $540,036 of the claimed deduction as a nonamortizable capital expenditure, which represents a portion of the net operating loss carryback from petitioner's short taxable year ended July 8, 1986. In addition to the $571,544 deduction claimed on the return, petitioner now seeks to deduct an additional $978,369 in expenses in conjunction with the consummation of the acquisition.

The issue presented for our consideration is whether petitioner, the acquired corporation in a takeover, may deduct under section 162[1] the expenditures it incurred incident to the takeover.

### Factual Background

Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner, Victory Markets, Inc. (hereinafter Victory Markets or petitioner), the parent of a group of affiliated corporations that filed consolidated income tax returns, had its principal office in Norwich, New York.

Petitioner is a New York corporation which, prior to a corporate takeover, owned and operated grocery stores and related businesses primarily in central and northern New York State. Prior to June 1986, shares of common stock of Victory Markets were publicly traded in the over-the-counter market. The price of Victory Markets' common stock for the period between May 1985 and May 27, 1986, ranged from $15.50 to $24.50 per share.

On May 23, 1986, Richard J. Hill (Hill), managing director of the investment banking firm of Wardley, Inc. (Wardley),

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

telephoned the office of Darryl R. Gregson (Gregson), president and chief executive officer of Victory Markets. Gregson, who was leaving for California on vacation, declined to accept the call and instructed his secretary to take a message. Hill communicated to the secretary, who in turn relayed to Gregson, that he represented a group that was interested in acquiring Victory Markets. Gregson, through the secretary, communicated to Hill his lack of interest.

During the evening of his arrival in California, Gregson received a message from Joseph Nishimura (Nishimura), chief financial officer of Victory Markets. When Gregson returned Nishimura's call, Nishimura informed him that corporate headquarters received a letter from Wardley addressed to Gregson earlier that same day. The Wardley letter disclosed that the party interested in acquiring Victory Markets was LNC Industries Pty.[2] Ltd. (LNC), an Australian corporation.

LNC is a wholly owned subsidiary of Permewan Wright Consolidated Pty. Ltd. (Permewan Wright), itself a subsidiary of JGL Investments Pty. (JGL), one of the largest privately held companies in Australia. All of JGL's stock is owned by its chairman, Jack Liberman (Liberman), and by other members of the Liberman family. In addition to being the largest importer of motor vehicles in Australia, LNC is also engaged in a variety of industrial manufacturing and distribution enterprises. In addition, LNC maintains an investment portfolio in diverse businesses. The business activities of JGL include: Retailing, textile manufacturing, cold storage facilities, food manufacturing, property management services, and real estate investments. From 1972, when it acquired Permewan Wright, through 1985, JGL was heavily involved in food retailing in Australia, owning over 500 food markets. LNC's worldwide sales for fiscal year ended June 30, 1985, were $320 million;[3] net income was $11 million. On June 30, 1985, LNC had assets of $227 million and stockholders equity of $106 million. Total sales for all businesses owned by the Liberman family for the fiscal year ended June 30, 1985, were over $1 billion.

---

[2] Pty. stands for proprietary, signifying that LNC is a privately held company.

[3] All currency references are in U.S. dollars, applying the prevailing rate on Mar. 31, 1986, of 71.2 cents per Australian dollar.

In the initial contact letter of May 23, Hill represented that "LNC is prepared to purchase all of Victory Markets' outstanding common stock for a cash payment substantially in excess of the current market price per share. To that end, LNC is prepared to negotiate and enter into a mutually acceptable merger agreement with your company."

In the letter Hill explained that "LNC has been impressed by the success of Victory Markets' management and wishes to emphasize its desire that Victory Markets operate as a separate and autonomous subsidiary of LNC." Toward that end, the letter stated that LNC intended to preserve the continuity of Victory Markets' senior management by continuing the existing employment arrangements or entering into mutually satisfactory employment agreements with the present members of senior management. The letter also stated that "Given the geographical distance and lack of presence here, LNC, unlike a domestic competitor of Victory Markets, would have no interest in closing or consolidating Victory Markets' facilities or operations." The letter further advised that LNC expected that Victory Markets would continue to maintain its headquarters in Norwich, New York. In closing, Hill represented that "LNC hopes that this transaction can be completed on a mutually acceptable and friendly basis." Hill's letter did not state a price-per-share offer.

Early the next day, May 24, 1986, Gregson telephoned Willkie, Farr & Gallagher (Willkie Farr), attorneys for Victory Markets, to discuss the letter and asked counsel to recommend an investment banking firm to provide a fairness opinion on any offer made by LNC. After consulting with counsel, Gregson telephoned Hill and communicated Victory Markets' lack of interest in being acquired and its desire to remain independent.

On Tuesday, May 27, 1986, after again consulting with counsel, Gregson telephoned each of the board members and apprised them of the situation. In addition, a letter was sent to the home of each board member along with a copy of Hill's letter. After receiving a vote of confidence from the board to remain independent, Gregson again contacted Willkie Farr to discuss the board's position and what its responsibilities were with regard to LNC's "expression of interest".

On May 28, 1986, Liberman submitted a written offer to Gregson, subject to the approval of Victory Markets' board of directors, to acquire all of Victory Markets' outstanding common stock for a cash payment of $30 per share. In the letter Liberman stated that to effectuate this objective, "LNC is prepared to negotiate and enter into a mutually acceptable merger agreement with your company." Liberman further advised that, in addition to the board's approval, the offer was "conditioned upon Victory Markets continuing to conduct business solely in the ordinary course." The letter also stated: "However, as Mr. Hill indicated to you, our offer is not conditioned upon the obtaining of financing." In his letter Liberman personally reiterated that LNC's intention was that Victory Markets' present management operate Victory Markets as a separate and autonomous subsidiary. Liberman further advised: "Since this matter is of the utmost importance to us, we must ask for the response of your Board of Directors no later than 5:00 P.M., New York time, on Tuesday, June 3rd. I hope you and your Board will consider LNC's offer carefully and will respond promptly so that together we can move expeditiously to complete a transaction."

Upon receipt of Liberman's letter and after consulting with Willkie Farr, Gregson negotiated a fee with E.F. Hutton (Hutton) to provide advice and services relating to any possible merger, tender offer, sale, or disposition involving all or any part of the business, assets, or stock of Victory Markets. The negotiations were memorialized in an agreement dated May 30, 1986, and executed by petitioner on June 3, 1986, which set forth E.F. Hutton's duties as follows:

(a) To provide financial advice to Victory Markets with respect to the LNC acquisition proposal;

(b) to provide the board of directors with an opinion as to the financial adequacy of the LNC offer (fairness opinion);

(c) to provide ongoing advice and counsel relating to the financial and strategic alternatives available to Victory Markets;

(d) to explore and develop opportunities for the sale of Victory Markets, if the board of directors so desired;

(e) to advise the board concerning opportunities for sale of Victory Markets, whether or not found by Hutton; and

(f) to represent Victory Markets in negotiations with LNC or any third party.

The agreement provided a fee structure for Hutton's professional services as follows:

(a) A financial advisory fee of $150,000 payable in cash upon execution of the agreement;

(b) an additional advisory fee of $200,000 payable at the time the acquisition is completed, or when the offer is either withdrawn or expires;

(c) an additional fee if the transaction occurs based on the incremental value received by Victory Markets and its shareholders on a per-share basis as follows: (i) Two percent of the incremental value resulting from a transaction price of $30 to $33, (ii) plus 4 percent of the additional incremental value resulting from a transaction price of $33 to $36, (iii) plus 6 percent of the additional incremental value resulting from a transaction price above $36.

On May 28, 1986, a special meeting of the board of directors was scheduled for May 30, 1986. The special meeting, the specific agenda of which was to discuss the offer, was held at the offices of Willkie Farr in New York, New York. Also present to advise the board were representatives from Willkie Farr and Hutton, as well as legal counsel for Hutton. Stephen Flood (Flood) of Willkie Farr outlined and reviewed for the board: The directors' fiduciary duties in considering the LNC proposal under New York law, matters applicable to the board's consideration under Federal securities laws, pertinent provisions of the corporation's bylaws, and the appropriate uses of a financial adviser such as Hutton. In addition, the minutes reflect that Flood reviewed with the board a "range of available bargaining enhancements for promoting favorable transactions and deterring hostile bids" including the purposes and features of various types of "poison pill" plans. So-called poison pill plans refer to rights dividend plans which afford the shareholders of a target corporation the opportunity to purchase shares of the bidder (or in some cases the target company) at a substantial discount from the market price. These plans discourage takeover attempts because of the diluting effect on the bidder (or the target company, depending on the provisions of the plan), both in terms of economics and voting power.

On June 3, 1986, the board of directors along with representatives from Willkie Farr and Hutton convened for another special meeting to discuss the 30-dollar-per-share

offer. At this meeting members of the board were provided with additional background information gathered by Australian counsel on LNC and the Liberman family. John Desrosier (Desrosier) of Hutton then presented Hutton's opinion as to the financial fairness of the proposal based on its study and review of Victory Markets' business, operations, and financial condition. Desrosier stated it was Hutton's opinion that the offer from the financial point of view of the stockholders was "clearly inadequate". Upon consideration of the information received, the board of directors unanimously resolved to reject the offer as clearly inadequate and authorized the president and executive vice president to communicate the board's decision to LNC.

According to the minutes of the June 3 meeting, after resolving to reject the offer, the board turned its attention to "matters relating to the strategy of responding to the LNC Proposal, with the object of determining the prospects of whether LNC could or would substantially increase its proposed price and whether LNC might pursue its proposal further by making a hostile tender offer." Flood was then called upon to present to the board the proposed rights dividend plan. In reviewing the specific details and operation of the proposed plan, Flood indicated to the board that implementation of the plan "would not hinder, and could facilitate, a transaction at an acceptable price". The board voted unanimously to adopt the rights dividend plan. The board further resolved to enter into employment contracts with certain senior officers and key employees. In addition to the discussions and actions concerning the LNC offer, the board of directors, as part of its ongoing business, considered and adopted a plan to install video centers in 79 of its existing stores.

Pursuant to the board's instructions, Gregson telephoned Hill on June 4 and communicated the board's rejection of the LNC offer. Following the telephone conversation between Gregson and Hill, Liberman made numerous attempts throughout the day to speak with Gregson by telephone. Sometime in the early evening, after conversations with counsel, Gregson returned Liberman's call. Telephone conversations between Gregson and Liberman concerning the continuing desire of LNC to purchase Victory Markets continued through June 5, 1986, culminating in an agreement to meet the following morning. During this meeting, Gregson

attempted to ascertain whether LNC had a willingness to proceed in a hostile manner and the possibility that LNC might increase the price of its offer.

During this time, Hutton, Willkie Farr, and Gregson had been identifying potentially more compatible offerors (so-called white knights) and from June 4 through June 6 discussions with three other companies were under way. In addition, during this period Gregson instructed the board of directors to stand ready for the call of another special meeting.

On the afternoon of June 6, Gregson was informed that LNC had increased its offer to $36 per share. At approximately 4 p.m. a special meeting of the board was held by means of telephonic conference. Gregson explained the nature of his earlier meeting with Liberman and reported that he had been advised that LNC was prepared to take an offer directly to the stockholders. However, Gregson also advised the board that LNC had indicated a willingness to increase its all-cash offer to $36 per share, if the board would recommend the terms of the transaction to the stockholders. The board continued discussions, the general consensus of which was that the board should accept the offer, until a brief recess was called. During the recess, Gregson contacted Hill and informed him that the offer "wasn't good enough" and the board was prepared to reject it. LNC responded by increasing its offer to $37 per share. When the meeting reconvened, Gregson informed the board that he had just been advised that LNC was willing to raise its offer to $37 per share. The board determined that the 37-dollar-per-share offer was fair and reasonable to the stockholders and voted unanimously to accept it.

On June 8, 1986, only 16 days after Hill's initial contact with Gregson, Victory Markets entered into an agreement and plan of merger with LNC, which set forth the terms of the offer and provided that a transitory LNC subsidiary, LNC Acquisition Corp. (LNCAC), would merge with Victory Markets. LNC paid $72,256,000 to purchase all of the outstanding common stock of Victory Markets. The source of acquisition funds included $35 million borrowed by LNCAC through bank loans arranged by LNC and $24,060,000 advanced from LNCAC in the form of loans. Upon acquisition Victory Markets was transformed from a publicly traded corporation to a closely

held, wholly owned subsidiary of LNC and LNCAC's obligations became the obligations of Victory Markets.

LNC advanced petitioner $24,060,000 to fund a portion of its acquisition by LNC and related expenses. On March 26, 1987, petitioner issued a $15 million promissory note to LNC to satisfy the unpaid portion of the LNC advance.

Subsequently, on December 30, 1988, LNC voluntarily canceled the $15 million note, and the proceeds of the note were applied to equity in Victory Markets. In its Securities and Exchange Commission form 10-K (form 10-K) for fiscal year ended December 31, 1988, petitioner stated that the conversion of the $15 million LNC note into equity and the pending conversion to equity of another $2.6 million in trust notes owed to LNC by June 30, 1989, would reduce the company's interest expense by approximately $2.3 million annually in future years.

On December 29, 1986, Victory Markets, pursuant to a right of first refusal contained in a supply agreement executed on March 3, 1984, acquired Chicago Markets Enterprises, Inc. (Chicago Markets), an operator of 11 supermarkets in the Utica-Rome, Mohawk Valley area of New York State. Petitioner's board of directors believed that the acquisition of Chicago Markets would have "a significant, long-term favorable impact upon future operations and liquidity."

Petitioner's aggregate net sales for fiscal year ended December 26, 1987, were approximately $481,800,000, a 16.2-percent increase over the prior year's net sales. This increase resulted primarily from a 6.5-percent increase in same-store sales due to the extensive remodeling of 14 stores, the addition of new features in many stores, as well as an 8.1-percent sales increase from the acquired Chicago Markets stores.

On April 29, 1988, petitioner acquired Carl's Drug Co. (Carl's), a chain of 48 promotional retail drug stores in upstate New York, for a price of $25,163,000. Petitioner's board of directors believed that in its plans for the development of larger store formats, Carl's expertise in pharmacy and general merchandise operations, as well as access to sources of supply, would be "invaluable" to Victory Markets. Petitioner purchased Carl's using a $25 million bank bridge loan to finance the transaction, which was subsequently

repaid in full with the proceeds of a $25 million loan from LNC's parent company, JGL.

On November 28, 1988, Victory Markets entered into an agreement with Big V Supermarkets, Inc., under which petitioner acquired seven additional supermarkets in the Albany, New York, area (the Albany stores). The acquisition of the Albany stores marked petitioner's first entry into this market area. Petitioner extensively remodeled, refurbished, and restocked the Albany stores. While the record is unclear as to whether the stores were open for business during the renovation period, by the end of February 1989, all the stores were in operation. From February through March 30, 1989, JGL advanced $5,500,000 to petitioner to fund working capital requirements for the remodeling and restocking of the Albany stores. Despite the highly competitive nature of the Albany market, petitioner in its form 10-K for fiscal year ended December 31, 1988, represented that "the Company is very optimistic of the long term potential of its entry into the Albany market with a viable group of stores at the onset."

Petitioner's aggregate net sales for fiscal year ended December 31, 1988, were approximately $563,800,000, a 14.8-percent increase in average weekly sales. Excluding Carl's, this represents a sales increase of 1.7 percent in average weekly sales, attributable to the additions of new features in several stores and major remodeling in seven stores.

## Discussion

The issue for decision is whether expenditures incurred by petitioner incident to its acquisition by LNC are deductible under section 162(a) or are required to be capitalized. This issue was recently considered by the Supreme Court in *INDOPCO, Inc. v. Commissioner,* 503 U.S. ___, 112 S. Ct. 1039 (1992). It is petitioner's position that unlike the taxpayer in *INDOPCO,* Victory Markets was acquired in a hostile takeover and therefore our decision may not be governed by *INDOPCO.*[4] The facts of that case, which are strikingly similar to those before us here, are as follows. Prior to its

---

[4] Implicit in petitioner's position is the argument that, as a matter of law, *INDOPCO, Inc. v. Commissioner,* 503 U.S. ___, 112 S. Ct. 1039 (1992), be narrowly construed to apply to "friendly" acquisitions only. Because we find that the facts of this case are not generally distinguishable from *INDOPCO,* we need not address petitioner's legal argument as to the proper scope of the *INDOPCO* holding.

acquisition the taxpayer was a publicly traded Delaware corporation. In October 1977, its two largest shareholders were approached by representatives of Unilever United States, Inc. (all the stock of which was owned by Unilever N.V., a publicly held Netherlands corporation), who indicated an interest in acquiring the taxpayer, one of its suppliers, through a friendly transaction. The two shareholders, who were married, expressed a willingness to transfer their stock to Unilever if a tax-free transaction could be structured for them. Attorneys representing both sides devised a reverse subsidiary cash merger, an acquisition plan which gave the taxpayer's shareholders an option to receive cash for their shares or transfer them to Unilever in a tax-free section 351 exchange.

In November 1977 Unilever made a formal proposal to the taxpayer's board of directors. To fulfill their fiduciary duty under Delaware law to ensure the transaction was fair to the stockholders, the board of directors engaged the services of an investment banking firm to evaluate the offer, render a fairness opinion, and generally assist in the event of the emergence of a hostile tender offer. After some negotiation over the price per share and the issuance of a favorable section 351 private ruling from the Internal Revenue Service, the transaction was consummated in August 1978.

The taxpayer, then known as National Starch & Chemical Corp., had petitioned this Court seeking a redetermination of respondent's disallowance of its treatment of the costs incurred in connection with the transaction as currently deductible ordinary and necessary business expenses under section 162. Finding that the taxpayer's directors determined it would be in the corporation's long-term interest to shift ownership of the corporate stock to Unilever, this Court held that the expenditures were not deductible under section 162(a). *National Starch & Chemical Corp. v. Commissioner,* 93 T.C. 67 (1989). Our holding was based on the following: (1) In fulfilling its fiduciary obligation to the corporation and its shareholders, the board in approving the takeover, ipso facto, must have determined that it was in the best interest of the taxpayer and its shareholders; (2) the taxpayer's 1978 annual progress report contained expressions of the benefits to be derived from the availability of Unilever's enormous resources, as well as statements made by the investment

banking firm that the taxpayer's affiliation with Unilever would create the opportunity for "synergy"; and (3) the taxpayer's opportunities were broadened as a result of the availability of Unilever's resources.

This Court's opinion contained the further explanation that since the expenditures were incurred incident to a shift in ownership the benefits of which "could be expected to produce returns for many years in the future", *id.* at 75 (quoting *E.I. duPont de Nemours & Co. v. United States,* 432 F.2d 1052, 1059 (3d Cir. 1970)) the expenditures were capital in nature. Moreover, it was noted that a lack of immediate benefit is immaterial as it does not imply the absence of long-term benefits. *Id.* at 76.

In affirming this Court's holding, the Court of Appeals for the Third Circuit observed that our finding that the taxpayer derived a long-term benefit from the takeover was amply supported by the evidence. *National Starch & Chemical Corp. v. Commissioner,* 918 F.2d 426, 432 (3d Cir. 1990). The Court of Appeals observed that Unilever's assets and operating income were "gargantuan" compared to those of the taxpayer's. The Court of Appeals also focused upon the statements contained in the 1978 annual progress report demonstrating the taxpayer's recognition that Unilever's "sheer wealth" provided a significant benefit. The Court of Appeals reasoned that "Although this was written after the takeover, there is no reason why it did not equally represent the view of the Board of Directors in agreeing to the takeover." *Id.* The Court of Appeals also found our subsidiary finding that the takeover created the possible opportunity for "synergy" to be significant. *Id.*

The taxpayer, relying on *Commissioner v. Lincoln Savings & Loan Association.,* 403 U.S. 345, 354 (1971), argued that because the expenses did not create or enhance a separate and distinct additional asset they could not be capitalized and therefore were deductible under section 162(a). *National Starch & Chemical Corp. v. Commissioner,* 918 F.2d at 428-431. In affirming our holding that "both Unilever's enormous resources and the possibility of synergy arising from the transaction served the long-term betterment of National Starch" the Court of Appeals rejected the taxpayer's interpretation of *Lincoln Savings, id.* at 432-433.

The Supreme Court, in a unanimous opinion, affirmed the lower courts. In discussing the relationship between deductions under section 162(a)[5] and capital expenditures under section 263,[6] the Court reiterated the "familiar rule" that "'an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer.'" *INDOPCO, Inc. v. Commissioner*, 503 U.S.____, ____, 112 S. Ct. 1039, 1043 (1992) (quoting *Interstate Transit Lines v. Commissioner*, 319 U.S. 590, 593 (1943)). The Court further noted that the taxpayer's burden is set in a taxing structure in which capitalization is the norm; deductions, on the other hand, unless specifically enumerated, are disallowed. *Id.*

After acknowledging that the distinctions between deductions and capital items are "those of degree and not kind", *id.* (quoting *Welch v. Helvering*, 290 U.S. 111, 114 (1933)), and therefore each case "turns on its own special facts", *id.* (quoting *Deputy v. du Pont*, 308 U.S. 488, 496 (1940)), the Court addressed the taxpayer's "separate and distinct asset" argument (an argument petitioner has advanced in this case). *Id.* at ____, 112 S. Ct. at 1044. In rejecting the taxpayer's argument, the Court explained that *Lincoln Savings* stands for the simple proposition that where an expenditure serves to create or enhance a separate and distinct asset the expenditure should be capitalized under section 263. However, the Court continued, this does not mean that the creation or enhancement of a separate and distinct asset is a prerequisite to capitalization. *Id.* The Court went on to further clarify its holding in *Lincoln Savings* by stating:

Nor does our statement in *Lincoln Savings* that "the presence of an ensuing benefit that may have some future aspect is not controlling" prohibit reliance on future benefit as a means of distinguishing an ordinary business expense from a capital expenditure. Although the mere presence of an incidental future benefit—"*some* future aspect"—may not warrant capitalization, a taxpayer's realization of benefits beyond the year in which

---

[5] Sec. 162(a) provides:

SEC. 162(a). IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

[6] Sec. 263(a)(1) provides:

SEC. 263(a). GENERAL RULE.—No deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *

the expenditure is incurred is undeniably important in determining whether the appropriate tax treatment is immediate deduction or capitalization. Indeed, the text of the Code's capitalization provision, section 263(a)(1), which refers to "permanent improvements or betterments," itself envisions an inquiry into the duration and extent of the benefits realized by the taxpayer. [*Id.* at _____, 112 S. Ct. at 1044-1045; fn. ref. and citations omitted.]

The Supreme Court referenced our finding that the taxpayer derived significant long-term benefits from the acquisition. *Id.* at _____, 112 S. Ct. at 1045. In addition to the availability of Unilever's enormous resources and the possible existence of "synergy" previously identified, the Supreme Court pointed out that National Starch also obtained benefits from its transformation from a publicly held, freestanding corporation to a wholly owned subsidiary. The Court noted in particular that National Starch was no longer subject to the shareholder-relations expenses of a publicly traded corporation; i.e., reporting and disclosure obligations, proxy battles, and derivative suits. *Id.* Additionally, the transaction served the interests of administrative convenience and simplicity by allowing the taxpayer to eliminate previously authorized but unissued shares of preferred stock and to reduce the total number of authorized shares of common stock. *Id.* at 1045-1046.

The Court, quoting *General Bancshares Corp. v. Commissioner,* 326 F.2d 712, 715 (8th Cir. 1964), concluded that the rationale behind the "well-established rule" that expenses incurred in reorganizing or restructuring a corporate entity are not deductible under section 162(a) because the purpose for which they are made " 'has to do with the corporation's operations and betterment * * * for the duration of its existence or for the indefinite future or for a time somewhat longer than the current taxable year' " applies equally in the context of a friendly takeover to the expenditures for professional services at issue. *Id.* at 1046.

*Nature of Takeover—Friendly or Hostile*

It is petitioner's position that unlike the situation in *INDOPCO,* the expenditures petitioner incurred were in connection with defending against a hostile takeover attempt. While petitioner has painstakingly attempted to characterize the nature of the takeover as hostile, the evi-

dence does not support such a characterization or finding. The initial letter from Wardley expressed LNC's desire to negotiate a mutually acceptable merger agreement and its hope that the "transaction can be completed on a mutually acceptable and friendly basis." The written offer from Liberman, submitted subject to the approval of petitioner's board of directors, reiterated the desire to proceed in a friendly and mutually acceptable manner. At no time did LNC attempt to circumvent the board of directors by making a tender offer directly to petitioner's shareholders. Moreover, the discussions at the June 3 board of directors meeting pertaining to the possibility of whether LNC might attempt to circumvent the board indicate that LNC's actions were not perceived by the board as hostile at that time. We note that petitioner's directors considered several defensive tactics should the takeover become hostile.

Our conclusion that the expenses incurred by petitioner were not to defend against a hostile takeover is further supported by the fact that the board did not activate the dividend rights plan it had adopted. For purposes of this case petitioner has attempted to cast the adoption of the rights plan as a defensive tactic to ward off an unwanted hostile takeover; however, the fact that petitioner never activated the plan leads us to conclude that it was adopted in the course of a negotiated takeover as a "bargaining enhancement". This conclusion is also evident from Gregson's statement in his letter to the shareholders announcing the merger. In the letter he stated that because LNC raised its offer from $30 to $37 per share the board "has concluded that the rights have served their purpose."

*Long-Term Benefit*

The parties disagree as to whether Victory Markets derived any long-term benefit from the merger. Petitioner contends that Victory Markets did not receive nor did the board anticipate any long-term benefit as a result of its acquisition by LNC, while respondent argues that Victory Markets did experience long-term benefits from the merger. The parties devoted considerable attention to various financial and operational indicators in support of their respective positions. In addition to its assertion that the board of direc-

tors determined its duty to the shareholders precluded it from recommending against acceptance of LNC's offer, petitioner contends that the board continued to believe that the acquisition would provide no benefit to petitioner or its business. Petitioner focused considerable attention on Victory Markets' pre- and post-acquisition debt to equity ratio to support its contention that the rapid increase in debt and interest expense inhibited development and did not provide new ability for expansion. Respondent's argument directs our attention to data demonstrating the comparative financial resources of the acquiring and the acquired corporation, as well as business and operational statistics and events to demonstrate the existence of immediate and long-term benefits. While we acknowledge that each side made persuasive arguments, consideration of the record as a whole leads us to conclude that the acquisition provided petitioner with long-term benefits which were extant when the board approved the merger.

We find petitioner's debt/equity argument less persuasive in the setting of this case because, in the context of leveraged buyouts, these transactions typically rely on large amounts of debt and increase debt/equity ratios in the acquired or newly formed companies well beyond conventional norms.[7] Accepting petitioner's argument conceptually would require us to conclude that whenever an acquisition results in an increase in the target's debt to equity ratio, a finding that no long-term benefit was obtained must follow. We cannot accept such a sweeping generalization as a universal truth. Moreover, despite petitioner's claim that expansion was inhibited, the facts are to the contrary.

Petitioner's strongly urged contention that the board of directors did not anticipate nor did Victory Markets obtain any long-term benefits from the merger is not supported by the record. Our conclusion that petitioner's directors determined that it would be in petitioner's long-term interest to accept the takeover offer is based on several factors. First, petitioner's press release announcing the merger recounted the vast holdings of the Liberman family's businesses, the skill and expertise of LNC's personnel, and JGL's familiarity

---

[7] House Comm. on Energy and Commerce, Merger Activity and Leveraged Buyouts: Sound Corporate Restructuring or Wall Street Alchemy? 2 (Comm. Print 1984).

with food retailing. Moreover, in its announcement petitioner represented to the public and its shareholders that in approving the merger the board of directors "concluded that a merger with LNC would strengthen Victory and put the company in an excellent position for further expansion." While as a general rule we do not consider after-the-fact occurrences, these factors in this case corroborate that the board's representations to its shareholders were substantially realized. Subsequent to its acquisition by LNC, petitioner underwent considerable expansion, becoming itself the acquirer of Chicago Markets, Carl's Drugs, and Big V Supermarkets. The $25 million bridge loan used by petitioner to finance its purchase of Carl's, an acquisition which the board believed would be invaluable to Victory Markets, was repaid in full with the proceeds of a loan from LNC's parent company. JGL advanced petitioner in excess of $5 million to fund working capital requirements in connection with the remodeling and restocking of its newly acquired Albany stores. These acquisitions and the moneys expended for remodeling and refurbishing petitioner's stores resulted in an increase in petitioner's aggregate net sales in the years immediately following the merger.

In addition, this Court's determination in *National Starch & Chemical Corp. v. Commissioner,* 93 T.C. 67 (1989), that the very availability of the resources of the acquiring corporation was an immediate, as well as a long-term benefit because it broadened the taxpayer's opportunities is equally applicable to the instant case. *Id.* at 76-77. Petitioner was a relatively small entity compared to the gigantic proportions of the acquiring parent corporation. Moreover, the rationale expressed by the Supreme Court, that the taxpayer in *INDOPCO,* in addition to resource-related benefits "obtained benefits through its transformation from a publicly held, freestanding corporation into a wholly owned subsidiary", *INDOPCO, Inc. v. Commissioner,* 503 U.S. ___, ___, 112 S. Ct. 1039, 1045 (1992), is equally applicable to the facts of this case.

Finally, "When a board addresses a pending takeover bid it has an obligation to determine whether the offer is in the best interest of the corporation and its shareholders." *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del. 1985). Under the New York Business Corporation Law, directors of

a corporation owe both the corporation and its shareholders a duty of care in execution of their directorial responsibilities. N.Y. Bus. Corp. Law sec. 717 (McKinney Supp. 1993). A director owes a corporation a loyalty that is undivided and an allegiance that is influenced in action by no consideration other than the corporation's welfare. *Litwin v. Allen,* 25 N.Y.S.2d 667 (1940). In New York the test of whether directors act with undivided loyalty towards the corporation has been articulated as whether corporate action taken is the result of the directors' exercise of their unbiased judgment in determining that such action will promote the corporate interests. *Chelrob, Inc. v. Barrett,* 57 N.E.2d 825 (N.Y. 1944); *Lippel v. Hirsch,* 119 N.Y.S.2d 453 (Sup. Ct. 1953).

Petitioner contends, and we find no evidence to the contrary, that the board of directors diligently exercised its duty of care in assessing LNC's offer. Accordingly, despite petitioner's present assertions to the contrary, petitioner's directors in approving the takeover must have determined that it was in the best interest of petitioner and its shareholders. See *National Starch & Chemical Corp. v. Commissioner,* 93 T.C. at 76.

In light of our determination that petitioner was acquired in a friendly takeover with resulting long-term benefits, we conclude that petitioner's expenses are capital in nature and not deductible under section 162.

*Decision will be entered for respondent.*