10-3578-ag(L)
Curcio v. Comm'r of Internal Revenue

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2011

(Argued: January 5, 2012    Decided: August 9, 2012)

Docket Nos. 10-3578-ag(L), 10-3585-ag(CON), 10-5004-ag(CON),
10-5072-ag(CON)

————————————

MARK CURCIO, BARBARA CURCIO, AMY L. SMITH, SAMUEL H. SMITH, JR.,
STEPHEN MOGELEFSKY, ROBERTA MOGELEFSKY, RONALD D. JELLING, LORIE A.
JELLING,

*Petitioners-Appellants*,

v.

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

————————————

ON APPEAL FROM UNITED STATES TAX COURT

Before:
        WINTER, HALL, and CHIN, *Circuit Judges*.

        Appeal from orders and decisions of the United

States Tax Court (Cohen, *J.*) finding deficiencies in

petitioners' income tax payments and assessing accuracy-

related penalties under 26 U.S.C. § 6662.

Affirmed.

Joseph M. Pastore III, Smith, Gambrell & Russell, LLP (Ira B. Stechel, John T. Morin, Jennifer L. Marlborough, Wormser, Kiely, Galef & Jacobs LLP, *on the brief*), New York, New York, *for Petitioners-Appellants.*

Randolph L. Hutter, Attorney, Tax Division, Department of Justice, Appellate Section (Gilbert S. Rothenberg, Acting Deputy Assistant Attorney General, Thomas J. Clark, Attorney, Tax Division, *on the brief*), Washington, D.C., *for Commissioner of Internal Revenue.*

Chin, *Circuit Judge*:

In these consolidated cases, petitioners were owners of four small businesses that enrolled in purported life insurance plans for employees.  Only the four principal owners and a stepson, however, were covered under the plans. The contributions to the plans -- amounting to hundreds of thousands of dollars -- were claimed as tax deductions by the businesses.

The Commissioner of Internal Revenue (the "Commissioner") concluded that these contributions should not have been deducted because, *inter alia*, they were not

"ordinary and necessary" business expenses within the meaning of the Tax Code. Disallowing the deductions resulted in additional passthrough income to petitioners on which they had not paid taxes. Accordingly, the Commissioner issued notices of deficiency to petitioners and assessed accuracy-related penalties.

Petitioners' cases were consolidated and tried before the United States Tax Court in March 2009. After trial, the tax court ruled in favor of the Commissioner, finding that petitioners owed deficiency payments and accuracy-related penalties. Petitioners appealed. We affirm.

## BACKGROUND

The following facts are drawn from the tax court's findings and the record on appeal, including stipulations of the parties, documentary evidence, and testimony of petitioners and their witnesses.

## A. The Benistar Plan

The Benistar 419 Plan (the "Plan") was established in 1997 by Daniel E. Carpenter. It was designed to be a

multiple-employer welfare benefit plan under 26 U.S.C. § 419A(f)(6). The "Plan provides death benefits funded by individual life insurance policies for a select group of individuals chosen by the Employer to participate in the Plan." (Ex. 33-J (Benistar Plan Brochure)) (A 1824). The only benefits "claimed to be provided by or through [the Plan] are pre-retirement death benefits for covered employees of participating employers." (First Stip. of Facts ¶ 41).

Businesses that enroll in the Plan contribute to a trust account maintained by the Plan. The Plan uses these contributions to acquire one or more life insurance policies on the lives of employees covered by the Plan; it withdraws funds from the trust account to pay the premiums on these policies. Each covered employee determines the type of insurance that the Plan will purchase on his behalf. Furthermore, the Plan allows participating businesses to choose the number of years for which contributions to the Plan will be required to fully pay for the death benefit or benefits provided through the Plan. The Plan is listed as

-4-

the beneficiary on each insurance policy and passes on the death benefit to the covered employee.

The Plan also allows participating businesses to withdraw from, or terminate, participation at any time. Upon termination, the Plan can distribute the underlying policies to the insured employees. Until mid-2002, an underlying policy could be distributed at no cost to the covered employee. From mid-2002 to mid-2005, the Plan required that the covered employee be charged 10% of the "cash surrender value" in exchange for the underlying policy. (Carpenter Exam. at 274-76). Starting in mid-2005, the Plan purportedly began to charge covered employees the "fair market value" of the underlying policy upon termination. (*Id.* at 125).[1]

The Plan advertises several "advantages," including (1) "Virtually Unlimited Deductions for the Employer"; (2) "Benefits can be provided to one or more key Executives on a selective basis"; (3) "No need to provide

---

[1]    Carpenter explained that the "fair market value" of the policy is equal to its "cash value." (Carpenter Exam. at 238).

benefits to rank and file employees"; and (4) "Funds inside the BENISTAR 419 Plan accumulate tax-free." (Ex. 33-J) (A 1825). Carpenter testified that "the beauty" of the Plan "is that you can put away extra money in good times and though the premium is not due, you can put away excess amounts of money, get a tax deduction today, and we don't put the premium in for years to come." (Carpenter Dep. at 262).

**B.** *Curcio and Jelling*

Petitioners Marc Curcio and Ronald D. Jelling each own 50% of three car dealerships: Dodge of Paramus, Inc. ("Dodge"), Chrysler Plymouth of Paramus, Inc. ("Chrysler Plymouth"), and JELMAC LLC ("JELMAC").

In or about 2001, Curcio and Jelling decided to enter into a buy-sell agreement.[2] The buy-sell agreement contemplated that if one partner died, the other would buy the deceased partner's 50% stake in the businesses. When the buy-sell agreement was executed, it set the value of the

---

[2] The agreement was not actually executed until 2003.

businesses at $12,000,000. To fund the purchase if it became necessary, each partner agreed to take out an insurance policy on the other's life. In other words, each partner would list the other as the beneficiary of his death benefit and the death benefit would be used to purchase the deceased partner's share of the businesses.

Instead of purchasing life insurance policies directly, however, Curcio and Jelling decided to insure themselves through the Plan. Accordingly, Dodge enrolled in the Plan on December 28, 2001. Curcio and Jelling were the only covered employees. They did not choose to insure any of the other 75 people employed by Dodge. Neither Chrysler Plymouth nor JELMAC enrolled, nor were any of their employees, other than Curcio and Jelling, covered.

Curcio and his insurance agent, Robert Iandoli, selected a whole life policy with a $9,000,000 death benefit. Jelling and his insurance agent, Alan Solomon, chose two policies -- one whole life policy and one universal (or adjustable) life policy -- totaling approximately $9,000,000 in coverage. Curcio paid a

$200,000 annual policy premium to the Plan. Jelling paid the same.

Although Dodge was the only entity to enroll in the Plan, Dodge was not always the only entity to contribute to the Plan. In fact, all three Curcio/Jelling business entities contributed to the Plan, with whichever entity having the highest cash balance at the end of the year doing so. Dodge contributed $400,000 in 2001 and 2002. JELMAC contributed $400,000 in 2003 and Chrysler Plymouth contributed $400,000 in 2004. Each business claimed a tax deduction for the entirety of its contribution. Jelling testified that he considered the contributions "as a funding for our buy sell agreement." (Jelling Exam. at 581).

Curcio and Jelling had asked their accountant, Stuart Raskin, about the deductibility of the contributions. Raskin consulted with his partners and, based on a letter from the law firm Edwards & Angell, LLP, concluded that a deduction was proper.[3] Raskin advised Curcio and Jelling

_____

[3] At the request of Carpenter, Edwards & Angell issued a series of letters opining on whether contributions to the Plan were deductible and met the requirements of

that the deduction was proper, but also communicated that this opinion was derived solely from the Edwards & Angell letter, and not from any independent research or investigation. Furthermore, Raskin did not offer Curcio or Jelling any assurances that the I.R.S. would approve the deductions. Neither Raskin, nor anyone at his firm, was an expert in welfare benefit plans.

## C. *Smith*

Petitioner Samuel H. Smith was, at all relevant times, the sole owner of SH Smith Construction, Inc. ("Smith Construction"). Smith Construction enrolled in the Plan in 2002. Although Smith Construction had 35-40 employees, it chose to insure only Smith through the Plan. On the

---

§ 419A. A November 2001 letter stated that it was "more likely than not" that a court would sustain deductions for contributions to the Plan. (Ex. 37-J at 2) (A 1959). It cautioned, however, that neither the Internal Revenue Code nor the tax regulations provided specific guidance on the issue. While deductions for life insurance were not *per se* improper, the I.R.S. could "challenge the amount deducted." (*Id.* at 3) (A 1960). Furthermore, an October 2003 letter noted that the determination of whether an expense is "ordinary and necessary" -- and therefore deductible -- "is quite subjective and dependent upon a totality of the facts and circumstances of a particular taxpayer." (Ex. 38-J at 5) (A 1968).

insurance application, Smith indicated that the purpose of the insurance was "retirement planning." (Ex. 116-J at 3) (A 3125). Smith chose a variable life policy with a death benefit of $5,000,000 and annual premium payments of $54,000. In 2003, Smith Construction claimed a $54,000 deduction for its contribution to the Plan.

By September 2005, Smith Construction had paid a total of $171,500 in premiums, and the policy had an accumulated cash value of $152,259.

By letter dated September 27, 2005, Smith requested that Benistar terminate his participation in the Plan. Moreover, he stated that he "would like to purchase the policies . . . and take ownership of the[m]." (Ex. 129-J) (A 3203). The Plan provided that Smith could purchase his policy by paying "10% of the net cash surrender value of the policy." (Ex. 175-J (Plan Termination and Policy Transfer Release Form)) (A 3372). Smith paid $2,970. This amount, however, equaled 10% of his policy's net cash surrender value on December 31, 2004, not 10% of the net cash surrender value in September 2005, when Smith

terminated his company's participation in the Plan and requested the transfer. In fact, his policy's net cash surrender value in September 2005 was $83,158, 10% of which would be $8,316. In April of 2006, Smith withdrew $77,300 from his policy. In January 2007, Smith borrowed $16,000 from his policy.

Smith testified at trial that he relied on his accountant's representation that contributions to the plan were deductible. He could not recall whether this representation was made orally or by email.

## D. *Mogelefsky*

Petitioner Stephen Mogelefsky is the sole owner of Discount Funding Associates ("Discount"), a corporation that provides mortgage broker services. Discount enrolled in the Plan in late 2002 to obtain life insurance for Mogelefsky and his stepson, an employee of the company. Mogelefsky chose a $1,300,000 policy on his own life so that "in case something happened to [him, his] son could take over the business." (Mogelefsky Exam. at 621). He also chose a $350,000 policy to cover his stepson. In December 2003,

Discount elected to provide Mogelefsky with additional life insurance benefits in the amount of $1,020,000.

In early 2003, Discount contributed $398,597 to the Plan. It claimed a deduction for this contribution in the 2002 tax year. In early 2004, Discount contributed another $354,821. It claimed a deduction for this amount in the 2003 tax year.

In March 2006, Mogelefsky and his stepson decided to withdraw from the Plan. To acquire his first policy, Mogelefsky paid $28,577. To acquire his second policy, Mogelefsky paid $14,632. By December 2005, the first policy had accumulated a cash value of $313,745 and had a net surrender value of $285,414. When the second policy was transferred on March 16, 2006, it had accumulated a cash value of $255,089. In December 2005, its net surrender value was $145,994.

## E.   *Procedural History*

The Commissioner sent notices of deficiency to Curcio and Jelling on January 23, 2007, and to Smith and Mogelefsky on June 25, 2007. Specifically, the Commissioner disallowed the deductions petitioners' business entities had

-12-

taken for contributions to the Plan because, *inter alia*, the contributions were not ordinary and necessary business expenses. Accordingly, the Commissioner found that petitioners had additional passthrough income on which they had failed to pay income tax. In addition to the deficiencies, the Commissioner assessed a 20% accuracy-related penalty on each petitioner.

In the case of Discount's first contribution, the Commissioner could not disallow the corresponding deduction because the statute of limitations on the 2002 tax year had passed. Instead, the Commissioner found that the contribution was 2003 income in the form of a constructive dividend or deferred compensation.

The four cases were consolidated and tried before the tax court in March 2009.[4] On May 27, 2010, the tax court issued a Memorandum Finding of Facts and Opinion (the "Memorandum Opinion"). In the Memorandum Opinion, the tax court agreed with the Commissioner, finding that the contributions made by petitioners' business entities were

--------

[4] Petitioners Barbara Curcio, Amy L. Smith, Lorie A. Jelling, and Roberta Mogelefsky are the wives of the business owners. They were named in this action only because they filed joint tax returns with their husbands.

-13-

not "ordinary and necessary" business expenses and, therefore, should not have been deducted. Moreover, it approved the Commissioner's unique treatment of Discount's first contribution. Finally, the tax court found that the improper deductions -- and petitioners' corresponding underpayment of tax -- were the result of negligence or disregard for the tax rules and regulations. Accordingly, the court issued four decisions, ordering due the deficiencies and penalties assessed by the Commissioner.

Curcio and Jelling appealed on August 24, 2010. Smith and Mogelefsky appealed on December 2, 2010. The appeals were consolidated on December 17, 2010.

## DISCUSSION

### A. Applicable Law

#### 1. Ordinary & Necessary Business Expenses

Section 162(a) of the Internal Revenue Code provides that a business may deduct "all the ordinary and necessary expenses paid or incurred" during the taxable year in carrying out that trade or business. 26 U.S.C. § 162(a). To qualify as an allowable deduction under § 162(a), an item must "(1) be paid or incurred during the taxable year, (2)

-14-

be for carrying on any trade or business, (3) be an expense, (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." *Comm'r v. Lincoln Sav. & Loan Ass'n*, 403 U.S. 345, 352 (1971) (some internal quotation marks omitted).

An "ordinary" expense is one that is "normal, usual, or customary in the type of business involved." *Int'l Trading Co. v. Comm'r*, 275 F.2d 578, 585 (7th Cir. 1960) (citing *Deputy v. du Pont*, 308 U.S. 488, 494-96 (1940)); *accord Sharon Herald Co. v. Granger*, 195 F.2d 890, 895 (3d Cir. 1952). An expense need not be habitual to be "ordinary," *see Welch v. Helvering*, 290 U.S. 111, 113-14 (1933), but the transaction "must be of common or frequent occurrence in the type of business involved," *du Pont*, 308 U.S. at 495. A "'necessary'" expense is one that is "'appropriate and helpful'" for the development of the taxpayer's business. *See INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 85 (1992) (quoting *Comm'r v. Tellier*, 383 U.S. 687, 689 (1966)).

Put simply, "[e]xpenditures may only be deducted under § 162 if the facts and the circumstances indicate that

the taxpayer made them primarily in furtherance of a bona fide profit objective independent of tax consequences." *Green v. Comm'r*, 507 F.3d 857, 871 (5th Cir. 2007) (internal quotation marks omitted). Purchasing or subsidizing benefits -- e.g., life insurance -- for employees might fall into this category to the extent it incentivizes employees to remain loyal to the business and perform to the best of their abilities. *See Schneider v. Comm'r*, 63 T.C.M. (CCH) 1787, at *11 (1992).

### 2. *Deductibility of Welfare Benefit Plan Contributions*

Contributions to welfare benefit plans are not deductible *per se*. 26 U.S.C. § 419(a)(1). To be deductible, such a contribution must qualify under some other provision of the Code. *Id.* § 419(a)(1)-(2). In fact, the I.R.S. has explicitly opined that the deductibility of contributions to an employee trust for life insurance is governed by § 162(a) of the Code and § 1.162-10 of the Regulations. *See* Rev. Rul. 69-478, 1969-2 C.B. 29 (discussing deductibility of term life insurance for active

-16-

and retired employees); 26 C.F.R. § 1.162-10 (1960) ("Amounts paid or accrued within the taxable year for . . . medical expense, recreational, welfare, or similar benefit plan, are deductible under section 162(a) if they are ordinary and necessary expenses of the trade or business.").

Accordingly, if a welfare benefit plan contribution is ordinary and necessary, it is deductible. The deduction, however, is generally limited to "the welfare benefit fund's qualified cost for the taxable year." 26 U.S.C. § 419(b). This limitation does not apply if the welfare benefit plan meets certain requirements set forth in § 419A(f)(6).

Therefore, in determining the deductibility of a welfare benefit plan contribution, the threshold question is whether the contribution is an ordinary and necessary business expense under § 162(a). Only if a court determines that the contribution is ordinary and necessary would it proceed with an analysis under § 419A(f)(6) to determine whether any limitations on deductibility apply.

### 3. *Accuracy-Related Penalties*

Section 6662 of the Internal Revenue Code provides for a 20% accuracy-related penalty on any portion of an underpayment that is attributable to, *inter alia*, (1) "[n]egligence or disregard of rules or regulations" or (2) "[a]ny substantial understatement of income tax." 26 U.S.C. § 6662(b)(1)-(2).

"'[N]egligence' . . . includes any failure to make a reasonable attempt to comply with the provisions of [the Code]." *Id.* § 6662(c). "'[D]isregard' includes any careless, reckless, or intentional disregard." *Id.* Disregard of rules or regulations is careless "if the taxpayer does not exercise reasonable diligence to determine the correctness" of his position. 26 C.F.R. § 1.6662-3(b)(2) (2012). Disregard of rules or regulations is reckless "if the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe." *Id.*

-18-

An understatement is "substantial . . . if the amount of the understatement for the taxable year exceeds the greater of -- (i) 10 percent of the tax required to be shown . . . or (ii) $5,000."  26 U.S.C. § 6662(d)(1)(A).  A taxpayer may avoid some or all of a "substantial understatement" penalty if (1) there was "substantial authority" supporting the taxpayer's ability to take the deduction; or (2) the relevant facts relating to the deduction were "adequately disclosed in the return" and there was a "reasonable basis" for the deduction.  *See id.* § 6662(d)(2)(B).  "Substantial authority" exists "only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment."  26 C.F.R. § 1.6662-4(d)(3)(i) (2012).

Finally, "no penalty shall be imposed . . . with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."  26 U.S.C. § 6664(c)(1).  "Generally, the most

-19-

important factor [in determining whether a taxpayer acted with reasonable cause and in good faith] is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability."  26 C.F.R. § 1.6664-4(b)(1).

## 4.  *Standard of Review*

We review the tax court's legal conclusions *de novo* and its factual findings for clear error.  *Robinson Knife Mfg. Co. v. Comm'r*, 600 F.3d 121, 124 (2d Cir. 2010).

Whether an expense is "ordinary and necessary" within the meaning of § 162(a) is a "pure question[] of fact in most instances."  *Comm'r v. Heininger*, 320 U.S. 467, 475 (1943); *accord McCabe v. Comm'r*, 688 F.2d 102, 104 (2d Cir. 1982).  Unless "a question of law is unmistakably involved," *Heininger*, 320 U.S. at 475, we review for clear error the tax court's determination that an expense was not an ordinary and necessary business expense, *McCabe*, 688 F.2d at 104-05.  *Compare Chenango Textile Corp. v. Comm'r*, 148 F.2d 296, 298 (2d Cir. 1945) (although tax court cited appellate court opinions to justify its conclusion, its decision was a determination of fact) *with Heininger*, 320 U.S. at 475 (tax

court mistakenly believed that denial was required as a matter of law). The tax court's finding is clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Estate of Stewart v. Comm'r*, 617 F.3d 148, 164 (2d Cir. 2010) (internal quotation marks omitted).

The determination that a taxpayer is liable for an accuracy-related penalty is also a factual determination reviewed for clear error. *See Nicole Rose Corp. v. Comm'r*, 320 F.3d 282, 284-85 (2d Cir. 2003) (citing *Goldman v. Comm'r*, 39 F.3d 402, 406 (2d Cir. 1994)).

**B.** *Application*

We review three of the tax court's rulings: first, the tax court determined that contributions to the Plan were not ordinary and necessary business expenses; second, the tax court ruled that Discount's first contribution on behalf of Mogelefsky was taxable as a constructive distribution; and third, the tax court concluded that accuracy-related penalties were warranted.

-21-

We review the first and third rulings for clear error.  The standard of review applicable to the second ruling is less clear, and the parties have provided no guidance on the issue.  We need not resolve the issue, however, because even applying *de novo* review, the tax court's second ruling was not erroneous.

### 1.  *Ordinary and Necessary Business Expenses*

The tax court did not clearly err when it found that the contributions by petitioners' business entities to the Plan were not ordinary and necessary business expenses. The record supports the conclusion that the contributions were not normal, usual, or "helpful for the development of the [taxpayers'] business," *see Tellier*, 383 U.S. at 689 (internal quotation marks omitted); they were not made in furtherance of a profit objective or for any viable business purpose, *see Green*, 507 F.3d at 871.  Rather, the evidence demonstrates that the contributions were made solely for the personal benefit of petitioners.  The contributions were a mechanism by which petitioners could divert company profits, tax-free, to themselves, under the guise of cash-laden

-22-

insurance policies that were purportedly for the benefit of the businesses, but were actually for petitioners' personal gain.

Indeed, the Plan was designed to benefit only owners and their families and not the businesses generally. Carpenter, who conceived of the Plan, admitted that the Plan was meant to cover only owners and their families. Moreover, he testified that "most of the people in the plan are looking for estate planning advantages."  (Carpenter Dep. at 156).  The Plan was essentially touted as a way for "Key Executives" to avoid paying taxes on business income by diverting it into a vehicle in which funds could accumulate tax-free.  (*See* Ex. 33-J (Benistar Plan Brochure) (noting that "Plan Advantages" included "unlimited deductions," "tax-free" accumulation, and "tax-free distribution at a later date")).

Evidence pertaining to the individual owners also demonstrates that contributions to the plan were for their personal benefit, not the benefit of their respective business entities.  Dodge, for example, enrolled in the Plan

-23-

so that Curcio and Jelling could fund the buy-sell agreement between them. The contributions to the Plan were not made in furtherance of a business objective, but rather to relieve Curcio or Jelling from having to use personal funds to pay for his partner's share of the business in the event the partner died. *See Petersen v. Comm'r*, 74 T.C.M. (CCH) 90, 98 (1997). Dodge employed approximately 75 other people, none of whom were covered under the plan.

Smith admitted that he enrolled his company in the Plan for the purpose of "retirement planning." (A 3125). None of the other 35-40 employees of Smith Construction were covered under the Plan. In late 2005, Smith paid approximately $3,000 to acquire ownership of his underlying life insurance policy. At the time, the policy had a cash value of over $150,000 and a net surrender value of over $83,000. He subsequently withdrew $77,300 from the policy and took out a $16,000 loan against it. Therefore, the record supports the conclusion that Smith's contributions to the Plan were not business expenses; they funded a life

insurance policy from which Smith himself later realized a significant personal monetary benefit.

Mogelefsky's company, Discount, deducted a total of over $750,000 in Plan contributions for the 2002 and 2003 tax years. In 2006, Mogelefsky paid less than $45,000 in exchange for ownership of the two underlying insurance policies. Around the time the policies were transferred, they had accumulated a total cash value of over $560,000 and a total net surrender value of over $430,000. Therefore, the record demonstrates that Mogelefsky, like Smith, diverted business profits, tax-free, into what eventually became a personal asset with a significant cash component.

To be sure, paying for life insurance for one's employees can be an ordinary and necessary business expense if the purpose is to compensate, incentivize, and retain key employees. *See Schneider*, 63 T.C.M. (CCH) 1787, at *11. But it is neither ordinary nor necessary when the insurance policies are purchased as investment -- or "estate planning" (*see* Carpenter Dep. at 156) -- vehicles for the sole benefit of the owners of the company. *See V.R. DeAngelis v. Comm'r*,

94 T.C.M. (CCH) 526, at *23 (2007) ("While employers are not generally prohibited from funding term life insurance for their employees and deducting the premiums . . . as a business expense . . . , employees are not allowed to disguise their investments in life insurance as deductible . . . when those investments accumulate cash value for the employees personally."), *aff'd*, 574 F.3d 789 (2d Cir. 2009) (per curiam).

Indeed, this case falls into the latter category. Petitioners' business entities employed scores of other individuals, but with the exception of Mogelefsky's stepson, none was offered life insurance coverage under the Plan. Petitioners cannot claim that they enrolled in the Plan to incentivize or retain themselves as employees, as they were the owners of the businesses.

We do not hold that purchasing a life insurance policy with a cash component can never be an ordinary and necessary business expense. Such a determination is fact intensive and must be made on a case by case basis. In this case, however, where petitioners could withdraw from the

Plan at any time and obtain personal control over cash-laden policies, and where other evidence in the record demonstrates that the taxpayers contributed to the Plan solely for their personal benefit, the tax court did not clearly err in finding that the contributions were not ordinary and necessary business expenses.

Petitioners argue that all contributions to a plan satisfying the requirements of § 419A(f)(6) are deductible in their entirety, without regard to whether those contributions are ordinary and necessary business expenses. (Pet. Br. at 57; Pet. Reply Br. at 6). Petitioners, however, cite no authority for this position and it is belied by the statutory scheme. Section 419(a) states that plan contributions "shall not be deductible" unless they would otherwise be deductible under another section of the Tax Code, such as § 162(a). Section 419(b) provides that if a contribution is deductible under another section of the Code, such a deduction is limited to the fund's qualified cost for the taxable year. Section 419A(f)(6), upon which petitioners rely, only supplies an exemption -- if certain

requirements are met -- to § 419(b)'s limit on deductibility.  It does not provide that such contributions are deductible in the first instance.[5]

Thus, the threshold question is whether plan contributions are deductible under another section of the Code -- here, § 162(a).  Because we find no clear error in the tax court's ruling that the plan contributions were not deductible under § 162(a) -- i.e., they were not ordinary and necessary business expenses -- we do not reach the issue of whether the Plan meets the requirements of § 419A(f)(6).[6]

---

[5]    Under petitioners' reading of the statute, a company enrolled in a plan that satisfies the requirements of § 419A(f)(6) could contribute and deduct the entire amount of its profits, avoiding its entire tax burden. Obviously, this was not what Congress contemplated.

[6]    On appeal, petitioners argue that if their entire contributions cannot be deducted, they should at least be able to deduct an amount equal to the annual "qualified cost" of the welfare benefit fund.  See 26 U.S.C. § 419(b), (d).  It does not appear, however, that petitioners raised this argument below, and thus we do not consider it.

## 2.  *The Tax Court's Treatment of Discount's*
## *Contributions Was Not Improper*

Discount -- on behalf of Mogelefsky -- made its first contribution to the Plan in early 2003, for which it claimed a deduction on its 2002 tax return.  It made a second contribution to the Plan in early 2004, for which it claimed a deduction on its 2003 tax return.  The Commissioner disallowed the 2003 deduction on the ground that the second contribution was not an ordinary and necessary business expense, creating additional passthrough income for Mogelefsky in 2003.  The Commissioner, however, did not have jurisdiction over the 2002 deduction, as the statute of limitations had run on the 2002 tax year.  Instead of disallowing the 2002 deduction, the Commissioner classified the first contribution as "constructive dividend income" or "deferred compensation" to Mogelefsky in the 2003 tax year.  (A 1317).  The tax court affirmed, finding that the first contribution was a constructive distribution.

Petitioners contend that the manner in which the tax court treated Discount's two contributions was

inconsistent and resulted in "double taxation."  (Pet. Br. at 78).  Moreover, they argue that the 2003 "distribution" accrued to Mogelefsky in the 2002 tax year, so it should not have been counted as income for 2003.  (*Id.* at 75-78).

Petitioners' argument is without merit. Mogelefsky was not taxed twice on either of the two contributions.  The tax court treated Discount's second contribution (for which a deduction was claimed in the 2003 tax year) like the contributions made by the other petitioners' business entities.  It found that the contribution was not an ordinary and necessary business expense, disallowed the deduction, and included the amount as taxable passthrough income to Mogelefsky.  The record does not reflect that this contribution was taxed at any other point.

The tax court treated Discount's first contribution (for which a deduction was claimed in the 2002 tax year) as a "distribution"[7] to Mogelefsky, to be taxed

_____

[7]    This Court has affirmed the treatment of welfare benefit plan contributions as "distribution[s] of corporate profits" where, as here, the contributions were used to

under 26 U.S.C. §§ 1366-68.  *See also* 26 U.S.C. § 301(c).[8]

Because Discount claimed a deduction in the 2002 tax year

for the amount of this contribution -- and that deduction

has not been disallowed -- Mogelefsky has not been taxed

twice on the amount of the contribution.

Petitioners have not pointed to any authority

prohibiting the Commissioner from recognizing these two

contributions under separate sections of the Tax Code.

---

purchase life insurance policies with large cash components
that were accessible to the insured.  *See DeAngelis*, 94
T.C.M. (CCH) 526, at *25.

[8]    Under § 1368, a distribution is not included in
income if the taxpayer has sufficient "basis" in his
corporation against which he can apply the distribution.  26
U.S.C. § 1368(b)(1).  Under such circumstances, his basis is
reduced by the amount of the distribution, *id.*
§ 1367(a)(2)(A), increasing the amount of his tax burden
when he sells his shares in the corporation.  On the other
hand, to the extent there is insufficient basis against
which the distribution may be applied, the distribution is
to be treated as a gain from the sale of property.  *Id.*
§ 1368(b)(2).

In Mogelefsky's case, the record did not reflect
his basis in Discount.  Therefore, the tax court treated the
entire distribution as being "in excess of basis" and taxed
it as gain from the sale or exchange of property.  *See id.*

Furthermore, the tax court did not err in finding that the distribution accrued to Mogelefsky in 2003 -- rather than 2002 -- because that is when it was "unqualifiedly made subject to [his] demands." *See* 26 C.F.R. § 1.301-1(b). Indeed, while Discount may have committed to making the contribution in 2002, it did not actually transfer the money to the Plan until 2003. It was only at that point that Mogelefsky could have terminated Discount's participation in the Plan and obtained the policy along with its cash component.

### 3. *Accuracy-Related Penalties*

Finally, we affirm the imposition of accuracy-related penalties. Specifically, the tax court did not clearly err in finding that petitioners were "negligent" and acted in "disregard" of the tax rules and regulations. Section 162(a) of the Tax Code is clear: To deduct a business expense, that expense must be "ordinary and necessary." 26 U.S.C. § 162(a). It is also clear that neither § 419 nor § 419A provides an independent ground for deducting welfare benefit plan contributions. *See* 26 U.S.C.

§ 419 ("Contributions paid or accrued by an employer to a welfare benefit fund . . . shall not be deductible under this chapter [unless] they would otherwise be deductible . . . ."). Petitioners' respective decisions to deduct the Plan contributions in the face of such clear statutory language could reasonably be classified as negligent behavior.[9]

Petitioners argue that they relied in "good faith" on the advice of their accountants. Reliance on professional advice, however, is not, by itself, an absolute defense to negligence. *Freytag v. Comm'r*, 89 T.C. 849, 888-89 (1987). Indeed, there was little reason for petitioners to believe that their accountants were authorities on the tax treatment of welfare benefit plan contributions or that they had sufficiently researched the issue. The accountants

---

[9] Part of Mogelefsky's accuracy-related penalty was assessed on a constructive-dividend theory, but the tax court did not disaggregate that aspect of the deficiency when imposing penalties. Mogelefsky, however, does not provide any argument on appeal that he should not have been assessed an accuracy-related penalty for failing to report Discount's 2003 contribution as a constructive dividend to him. We therefore do not need to consider the matter. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

for Curcio, Jelling, and Mogelefsky told them that they had solely relied on the Edwards & Angell letter.

Moreover, the record does not reflect that petitioners conducted an investigation sufficient to avail themselves of a "good faith" defense. *See* 26 C.F.R. § 1.6664(c). Had petitioners reviewed the Edwards & Angell letters upon which their accountants so heavily relied, they would have learned that Edwards & Angell made no guarantees as to the deductibility of Plan contributions. In fact, the letters specifically warned that the Commissioner could disallow petitioners' deductions based on a finding that the amount of the contributions was not ordinary and necessary.

### *CONCLUSION*

For the reasons stated above, the decisions of the tax court are affirmed.