[PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-12875
_____

D.C. Docket No. 1:17-cv-00326-ALB-SRW


ALAN C. TURNHAM, M.D., et al.,

Plaintiffs-Appellants,

versus

COMMISSIONER OF INTERNAL REVENUE,

Defendant-Appellee.


_____

On Appeal from The United States District Court
For the Middle District of Alabama

_____

(November 6, 2020)

Before NEWSOM and BRANCH, Circuit Judges, and RAY,[*] District Judge.

RAY, District Judge:

While the changeover from winter to spring is marked by warmer days and the greening of landscape, a less desirable indication of the change of seasons is the obligation to file one's annual Federal tax return. This duty, though never pleasant, is a part of our civic and legal responsibility.

In a sense, the Federal tax structure is the ultimate honor system, as it "is based on a system of self-reporting." *United States v. Bisceglia*, 420 U.S. 141, 145 (1975). In other words, although independent information is often forwarded to the government by third parties, our system depends upon taxpayers fairly and honestly informing the government as to both their income for the previous year and any deductions that would reduce the taxable amount. And, sometimes the law imposes a duty upon the taxpayer to inform the Internal Revenue Service ("IRS") when the taxpayer has taken a tax deduction that is questionable. This appeal presents just such a case.

The Appellants, a medical doctor and the subchapter S Corporation for which he works, filed suit against the IRS due to penalties it assessed against them for their failure to inform the IRS about questionable deductions the Corporation took for

---

[*]The Honorable William M. Ray II, United States District Judge for the Northern District of Georgia, sitting by designation.

2

contributions it made for life insurance benefits. For several years, the Corporation participated in a multi-employer welfare benefit plan designed to provide pre-retirement and post-retirement life insurance benefits to covered employees. Multi-employer plans enable small employers to pool their contributions to purchase insurance for their employees, often at cheaper rates, and the employers may claim tax deductions for the contributions if they are otherwise deductible as ordinary and necessary business expenses under I.R.C. § 162(a). *See Curcio v. Commissioner, T.C. Memo*. 2010-115, 2010 WL 2134321, at \*13 (2010), aff'd, 689 F.3d 217 (2nd Cir. 2012). While there generally are limitations on the amount of the deduction allowed (rules §§ 419 and 419A), those limits do not apply if the plan has 10 or more participating employers and meets other conditions, such as that the employers cannot normally "contribute more than 10 percent of the total contributions, and the plan must not be experience rated with respect to individual employers."[1] Notice 95-34, 1995-1 C.B. 309, 1995 WL 300780, at \*1 (June 5, 1995).

Because the IRS became aware that some financial companies offered multi-employer welfare benefits plans that included 10 or more employers, but did not satisfy the other requirements so as to qualify for the full deduction for the contributions, the IRS issued Notice 95-34 to warn about the types of plans that were

---

[1] Experience rating is a measurement that the insurance industry uses to evaluate the insurance risk of an employer based on their experience.

not entitled to the § 419A(f)(6) deduction.[2]  When a welfare plan is equivalent to the plans listed in the notice, or at least substantially similar thereto, the affected taxpayers benefiting from the deductions must put the IRS on notice of the questionable nature of the claim,[3] so as to allow the IRS an opportunity to examine the same, such as through an audit.

The Appellants, however, gave no such notice to the IRS regarding the deductions they were claiming for the nearly $837,000 in contributions the Corporation made to its multi-employer benefit plan for 2009-2011.  When it found out nonetheless, the IRS issued the tax penalties pursuant to statute for Appellants' failure to file the required notices.[4] The Appellants sued to overturn those penalties, and the district court granted summary judgment to the IRS.  Upon review of the record that is before us on this appeal, and with the benefit of oral argument, we have no difficulty in determining that the district court correctly granted summary judgment to the IRS.  The subject plan is at least substantially similar to the type of

---

[2]*Tax Problems Raised by Certain Tr. Arrangement Seeking to Qualify for Exemption from Section 419*, 1995-1 C.B. 309 (1995) ("Guidance is provided to taxpayers concerning the significant tax problems raised by certain trust arrangements being promoted as multiple employer welfare benefit funds exempt from the limits of sections 419 and 419A of the Code. In general, these arrangements do not satisfy the requirements for exemption under section 419A(f)(6).").

[3] The required disclosure of participation in these transactions must be made on an annual Form 8886 (Reportable Transaction Disclosure Statement). 26 C.F.R. § 1.6011-4(d).

[4] *See Turnham v. United States*, 383 F. Supp. 3d 1288, 1289 (M.D. Ala. 2019) (noting "[t]hat statute [26 U.S.C. § 6707A] imposes penalties on persons who fail to include information on their returns 'with respect to a reportable transaction'").

plans that the IRS has indicated do not qualify for the exemption and the corresponding full deduction.  Accordingly, we affirm the district court's decision that the IRS was correct to issue the penalties on the ground that the Appellants did not file the required notice.

The subject employee welfare plan was marketed as the PREPare Plan (the "Plan").  Participating employers contribute funds to the Affiliated Employers Health & Welfare Trust (the "Trust"), which then uses these contributions to purchase and maintain group term life insurance policies and annuity products that fund the benefits.  A participating employer's contributions to the Trust are divided into two parts.  One portion of the contributions is forwarded by the Trust to the insurance company, which uses them to pay the premiums required to maintain the group term life insurance that funds the covered employees' pre-retirement death benefits. The second, and indeed the overwhelmingly larger, portion of the contribution is invested into an annuity contract with the insurance company. Thus, the Plan provides term life insurance coverage for participating employees until they retire, and after retirement, the Plan provides them with a certificate of insurance that is "fully paid-up" (meaning that no further premiums would be owed, ever).

A most interesting aspect of these transactions is that the promoters of the Plan advised that, with fully paid up certificates of insurance, "a participant could make an irrevocable assignment of the beneficiary and, by doing so, move the

5

insurance out of his estate; alternatively, he could sell the death benefit to a willing beneficiary or convert the certificate in whole or in part to a health reimbursement benefit." *Vee's Marketing, Inc. v. United States*, No. 13-CV-481-BBC, 2015 WL 2450497, at *2 (W.D. Wis. May 21, 2015), aff'd, 816 F.3d 499 (7th Cir. 2016).  In other words, potential participants were told that they "would be the beneficial owner[s] of the paid-up contract and could add it to [their] estate planning trusts, sell the contract for cash or trade it for medical benefits." *Id.* (covered employees "[could] sell a portion or all of [their] post-retirement coverage to an independent settlement company in exchange for a lump-sum or stream of income payment.").

Also important is that the Plan, through the investment company, kept track of the contributions on an employer-by-employer basis, despite that it purported to aggregate employer contributions to provide group-based benefits.  *See Vee's Marketing*, 2015 WL 2450497, at *2 (noting that the Plan promoter "maintained records of the contributions by each employer to the Trust, . . . and handled each participant's payments separately from those of any other participant").  The Plan Administrator forwarded employer contributions to the insurance companies with instructions to apply the premiums to the accounts of specific individually covered employees; the Trust maintained separate records for each employer, and the insurer kept detailed accounts of the amounts attributed to each covered employee.  The

6

insurers also allocated each contribution, per the Plan Administrator, to each individual employee's group insurance premium and group annuity account.

Now, it is true that the Plan documents prohibited participants from accessing funds contributed to the Trust. Yet, it is also undisputed that the Plan Administrator withdrew funds attributed to a participating employer's covered employees from a group annuity contract and then used those funds to pay group term life insurance for the same employees. This allowed the Plan Administrator to pay an employer's current expenses from amounts that the employer had already contributed but had been invested in an annuity. The point here is that this set up is less like an independent (and acceptable) multi-employer benefit plan and more like the listed "reportable transactions" for which the IRS had indicated would not qualify for an exemption from the deduction limits.

These listed transactions "typically are invested in variable life or universal life insurance on the lives of the covered employees." 1995-1 C.B. 309. A universal life insurance policy is a quasi-insurance product in which the premiums partly fund death benefits and partly accumulate and earn interest to fund future benefits for the covered person. *See Anderson v. Wilco Life Ins. Co.*, 943 F.3d 917, 920–21 (11th Cir. 2019). While the investment scheme here did not use universal life insurance

7

products in the literal sense, there really isn't any difference in practical effect.[5] The combination of a term life policy with a separate (and much larger) annuity product provided the same generous excess of funds that a universal life policy would itself provide. And, there is no dispute that a welfare plan using a universal life policy would likely not be exempt and the contributions thereto would likely not be fully deductible.

Another red flag in the subject Plan was the large size of the contributions and how they were allocated. As to the Appellants, for the three tax years at issue (2009-2011), only a tiny fraction (roughly 3%) of the nearly $837,000 in contributions was used to pay the premiums on the group life insurance policy for the Corporation's employees. The rest was directed into the group annuity account; yet, the Appellants claimed a deduction for the entire amount. The result was a significant reduction or elimination of business income and taxes that would have been due.

In granting summary judgment to the government, the district court properly recognized the similarities between the facts of this case and those in *Vee's Marketing, Inc*. decided by the Seventh Circuit. That case involved the same Plan at issue here and for which the Seventh Circuit found that the IRS correctly assessed penalties for that taxpayer's failure to give the same type of notice at issue in this

---

[5] *See Turnham*, 383 F. Supp. 3d at 1292 ("That is how the plan was marketed, and that is how it appeared to operate in practice").

case. *See Vee's Mktg., Inc. v. United States*, 816 F.3d 499, 501 (7th Cir. 2016). In both cases, the employer contributions were large compared to the cost of the term insurance, the Plan invested in the products which amounted to the equivalent of universal life insurance, the trusts owned the insurance contracts, the trust administrator advised that employees could get benefits by selling their share of the annuity cash value, and the Plan maintained a separate accounting of the assets per employer and reflected that separate accounting in reports. We find the holding in *Vee's Marketing* persuasive in the matter before us.

Having discussed what this case is about, it is important to note that this case will not decide the ultimate issue as to whether the Appellants were entitled to claim the questioned deductions; that is the subject of other litigation between the Appellants and the IRS which is pending in the Tax Court. We do not prejudge who will prevail in that companion litigation. We find here, however, that as a matter of law the subject Plan is at a minimum "substantially similar" to the listed transaction in the IRS Notice, such that the Appellants were required to disclose their participation in it, as IRS regulations dictated. Because they failed to do so, the IRS properly issued the penalties against them. Thus, the district court correctly decided to grant summary judgment to the IRS.

**AFFIRMED.**